UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                :

            - against -               :

DAVID B. CHALMERS, JR.,                 :
OSCAR S. WYATT, JR.,
JOHN IRVING,                            :
LUDMIL DIONISSIEV,
CATALINA del SOCORRO MIGUEL             :
FUENTES, a/k/a "Cathy Miguel,"
MOHAMMED SAIDJI,                        :
BAYOIL (USA), INC.,
BAYOIL SUPPLY & TRADING LIMITED,        :
NAFTA PETROLEUM COMPANY LIMITED,
MEDNAFTA TRADING COMPANY LIMITED,       :
and SARENCO, S.A.,
                                        :
            Defendants.
                                        :
- - - - - - - - - - - - - - - - - -x

**OPINION**

S5 05 Cr. 59 (DC)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/22/07

**APPEARANCES:** (See last two pages)

**CHIN, D.J.**

          In this case, the Government alleges that defendants
paid secret and illegal surcharges to the Government of Iraq in
exchange for the right to receive allocations of Iraqi oil under
the United Nations Office of the Iraq Programme, Oil-for-Food
(the "Program"). Defendants are charged with wire fraud,
engaging in prohibited financial transactions with Iraq,
conspiracy, and violations of the International Emergency
Economic Powers Act ("IEEPA"). Defendants move to dismiss
certain charges and for other relief.

## BACKGROUND

The Court assumes familiarity with the facts of this case, as set forth in its Opinion of January 25, 2006, United States v. Chalmers, 410 F. Supp. 2d 278 (S.D.N.Y. 2006).

Before the Court are two sets of pre-trial motions -- one filed by defendants David B. Chalmers, Jr., Ludmil Dionissiev, Bayoil (USA), Inc., and Bayoil Supply & Trading Limited (together, the "Bayoil Defendants"), and the other filed by defendant Oscar S. Wyatt, Jr.  These motions were filed on May 5, 2006, seeking relief with respect to the third superseding indictment.  Shortly thereafter, on May 15, 2006, a grand jury returned a fourth superseding indictment.  The Government filed its opposition to the pre-trial motions on August 25, 2006.

On September 18, 2006, several weeks before defendants filed their reply briefs on October 4, 2006, a fifth superseding indictment, S5 05 Cr. 59 (DC) ("Indictment"), was returned.[1] Counts One through Four of the Indictment charge defendants with: (1) conspiracy to commit wire fraud and to engage in prohibited financial transactions with Iraq in violation of 18 U.S.C. §§ 1343 & 2332d; (2) wire fraud in violation of 18 U.S.C.

---

[1]     Except where noted, the allegations in the third superseding indictment to which defendants direct their pre-trial motion arguments are virtually unchanged in the fifth superseding indictment.  On January 10, 1997, the Government filed a sixth superseding indictment adding additional defendants Ephraim Nadler, a/k/a "Fred Nadler," and Benon V. Sevan.  These two individuals are the only defendants named in the sixth superseding indictment.  References herein are to the fifth superseding Indictment, unless otherwise indicated.

§§ 1343, 1349 & 2; (3) engaging in prohibited financial transactions with Iraq in violation of 18 U.S.C. §§ 2332d & 2; and (4) violating IEEPA, 50 U.S.C. § 1701, et seq.  Count Five, previously charged against defendant Tongsun Park,[2] now charges Wyatt alone with an additional violation of IEEPA.  Also before the Court is Wyatt's motion to dismiss Count Five or for alternative relief.

**DISCUSSION**

**A.   Pre-trial Motions to Dismiss**

**1.   Legal Standard**

An indictment is sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  United States v. Solomonyan, 451 F. Supp. 2d 626, 640 (S.D.N.Y. 2006) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).  As the Second Circuit has explained, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (citations omitted).  Furthermore, when deciding a motion to dismiss, a court must accept all

---

[2]     Count Five of the third and fourth superseding indictments charged Park with conspiracy to act as an unregistered agent of a foreign government, violating the Foreign Agents Registration Act, and laundering money.  Park was severed from this case and proceeded to trial in June and July of 2006.

factual allegations in the indictment as true.  United States v. Clarke, No. 05 Cr. 17, 2006 WL 3615111, at *1 (S.D.N.Y. Dec. 07, 2006) (citations omitted).  A court should not look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998).

### 2.   Count Two (Wire Fraud)

The wire fraud statute provides, in pertinent part:

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall [be guilty of a crime].

18 U.S.C. § 1343.  The Second Circuit has held that the essential elements of wire fraud are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the wires to further the scheme.  Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004)); see 18 U.S.C. § 1343.

The Indictment contains more than adequate allegations with respect to the first and third elements of wire fraud.  The Indictment sets out in considerable detail a scheme to defraud -- the "Surcharge Scheme" -- pursuant to which defendants agreed to pay and did pay millions of dollars of secret illegal surcharges

to the Government of Iraq in exchange for oil allocations that
they otherwise would have been prohibited by law from receiving.
(Indictment ¶¶ 7, 14-23).   The Indictment describes the roles of
each defendant in the scheme, the steps taken in furtherance of
the scheme, and the approximate dates and locations of those
events.  (Id. ¶¶ 8-17, 19-23, 27).   The Indictment also charges
defendants with using wire transmissions to further the Surcharge
Scheme.  (Id. ¶ 27).

It is the second element of wire fraud -- that money or
property was the object of the scheme to defraud -- that forms
the basis for defendants' motions.   The Indictment alleges that
the Surcharge Scheme resulted in the diversion of funds from the
Oil-for-Food Program Bank Account ("OFFP Bank Account").  (Id.
¶¶ 20, 23).   Specifically, it alleges that "[b]y participating in
this Surcharge Scheme and bypassing the Oil-for-Food Program,
[defendants and others] caused funds to be diverted from the
Oil-for-Food Program Bank Account that otherwise would have been
available to purchase humanitarian goods under the Oil-for-Food
Program." (Id.).   The victims of the Surcharge Scheme, as
identified by the Government, were the Iraqi People and the
Oil-for-Food Program itself.   Chalmers, 410 F. Supp. 2d at 287.
The thrust of defendants' motions is that the Indictment fails to
allege that these two entities had a valid property interest in
the funds allegedly diverted from the OFFP Bank Account.

As a preliminary matter, I first turn to whether, as
the Bayoil Defendants maintain, wire fraud requires a victim.

- 5 -

(See Bayoil Defendants Letter dated Dec. 15, 2006 to Court at 1-2).  I hold that wire fraud does indeed require a victim or intended victim.  The wire fraud statute is limited in scope to the protection of money or property rights.  Fountain, 357 F.3d at 255 (citing McNally v. United States, 483 U.S. 350, 360 (1987)); see, e.g., Cleveland v. United States, 531 U.S. 12, 26 (2000) (holding that State was not victimized by scheme to defraud because it was not deprived of any property interest and stating that "any benefit which the Government derives from the [mail fraud] statute must be limited to the Government's interests as property holder.") (quoting McNally, 483 U.S. at 359 n.8) (emphasis in original).  As the Supreme Court has held, an element of wire fraud is that the object of the scheme to defraud be money or property "in the victim's hands."  Pasquantino v. United States, 544 U.S. 349, 355 (2005) (quoting Cleveland, 531 U.S. at 26).  It is difficult to imagine how the Government could prove a violation of a statute intended to "punish[] those who had fraudulently deprived others of their property," United States v. Schwartz, 924 F.2d 410, 416 (2d Cir. 1991) (citing McNally, 483 U.S. at 358-61), without showing who those "others" were.

     In any event, the Government has identified the two victims of the Surcharge Scheme and I next address defendants' arguments that the Indictment fails to allege that the Surcharge Scheme deprived these purported victims of a legitimate property interest.

- 6 -

a.   **Defendants' Contention That No Monies**
     **Were Diverted**

At the outset, the Bayoil Defendants claim that the
very structure of the Oil-for-Food Program precludes the
Government's theory that the Surcharge Scheme deprived the
Program or the Iraqi People of any property.  They explain the
structure of the Program as follows:  Under the Program Iraqi oil
was sold at the Official Selling Price ("O.S.P.") -- a price
fixed by a committee made up of member states of the United
Nations ("U.N.") Security Council upon the recommendation of a
rotating group of U.N. oil overseers.  (Indictment ¶ 5).  The
Iraqi Government determined the quantity of oil to be sold, and
the resulting funds were deposited into the OFFP Bank Account.
(Id. ¶¶ 2, 6).  The Iraqi Government alone selected the companies
and individuals who received the rights to purchase Iraqi oil
under the Program.  (Id. ¶ 6).  These rights were referred to as
"allocations."  (Id.).  The allocation recipients were able to
reap large profits by selling their allocations at a premium to
brokers and/or companies capable of transporting the oil to a
refinery.  (Id.).

The Bayoil Defendants argue that even assuming they
paid secret surcharges to the Government of Iraq in exchange for
oil allocations, the payment of these surcharges could not have
diverted any monies away from the Oil-for-Food Program.  This is
because, they claim, the surcharges were "above" the O.S.P. and
had no impact on the flow of proceeds from the legitimate sales

of oil into the OFFP Bank Account.  Accordingly, they conclude
that "[a]ll that occurred was a transfer of a substantial portion
of the premiums received by the allocations holders to the Iraqi
Government itself." (Bayoil Mem. at 5).  The Indictment,
however, plainly alleges that the Surcharge Scheme diverted
monies from the OFFP Bank Account (Indictment ¶¶ 20, 23), and for
purposes of these motions, I accept the allegations as true.
Furthermore, defendants are alleged to have lobbied U.N.
officials to lower the O.S.P. as part of the Surcharge Scheme.
(Id. ¶¶ 19-20).  Thus, the O.S.P. might have been higher -- and,
in turn, more money would have flowed into the OFFP Bank Account
-- but for defendants' actions.  This aspect of the Bayoil
Defendants' motion is therefore denied.

> **b.   The Iraqi People**

Next, defendants argue that the Iraqi People do not
have an independent juridical personality under international law
and, therefore, cannot be a victim within the meaning of the wire
fraud statute.  They further contend that recognition of the
Iraqi People as an entity separate from the Government of Iraq
would undermine Iraqi state sovereignty and negatively impact
foreign relations.  They also assert that the Iraqi People had no
independent and distinct interest in the OFFP Bank Account funds.
Those funds, they maintain, were property of the Iraqi
Government, which, within its discretion, could purchase
humanitarian goods for distribution to the Iraqi People.

I reject the suggestion that the Iraqi People, because they are subjects of the Government of Iraq and lack a separate legal personality under international law, are not cognizable victims withing the meaning of the wire fraud statute.  The Government correctly makes the point that wire fraud victims are not limited to those entities considered "persons" under international law.  For instance, the states comprising the United States are not states for purposes of international law and, therefore, they are not "persons" under international law.  See Restatement (Third) of Foreign Relations Law § 201 cmt. g (1987).  Yet the states of the United States are capable of being victims of wire fraud.  See, e.g., United States v. Helmsley, 941 F.2d 71, 93-95 (2d Cir. 1991) (scheme to defraud New York State of income taxes).  Here, whether the Iraqi People have a legal personality independent of the Government of Iraq is irrelevant to whether the Surcharge Scheme deprived them of money or property.

Morever, as the Second Circuit has stated, "what is proscribed [by the wire fraud statute] is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property . . . . The identity and location of the victim [of the scheme to defraud] . . . are irrelevant." United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997) (emphasis in original).  In Trapilo, the Second Circuit held that a scheme to defraud the Canadian government of tax revenue was a cognizable offense within the

scope of the wire fraud statute.  In so holding, the court held that the wire fraud statute "reaches any scheme to defraud involving money or property, whether the scheme seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments."  Id. at 552 (emphasis in original) (citing cases).  Furthermore, this is not a case in which principles of international comity counsel against allowing the Government to proceed on its wire fraud theory.  Compare United States v. Giffen, 326 F. Supp. 2d 497, 506-07 (S.D.N.Y. 2004) (dismissing count of indictment charging defendant with making unlawful payments to Kazakh officials to obtain business for his New York-based company, thereby depriving Kazakh citizens of the honest services of Kazakh government officials, on comity grounds, as court would not undertake an analysis of "the compact between Kazakh citizens and their government").  Here, the Court need not make any determinations as to foreign law to recognize the Iraqi People as cognizable victims of the Surcharge Scheme.

Nor do I find compelling Wyatt's argument that recognizing the Iraqi People as victims of the Surcharge Scheme would offend Iraqi sovereignty and impermissibly allow the Court to make foreign policy determinations.  Allowing the Government to proceed on its wire fraud theory is not tantamount to any "official recognition" of the Iraqi People as distinct from the Government of Iraq.

Wyatt also relies heavily on Knox v. Palestine Liberation Org., 306 F. Supp. 2d 424 (S.D.N.Y. 2004), to support

this argument, but his reliance is misguided.  In Knox, plaintiffs, the representatives of an American citizen killed in an attack on a banquet hall in Israel, sued the Palestine Liberation Organization ("PLO"), the Palestinian Authority ("PA"), and others, claiming that the gunman responsible for the attack was an employee, agent, and/or co-conspirator of the PLO and PA.  The Court wrestled with the questions of (1) whether the PLO and PA could be considered "states" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), thereby rendering them immune from suit in the United States, and (2) whether Palestine, if in fact it existed as a sovereign state, was entitled to immunity under the FSIA.  Guided by concerns over the political implications of these questions, the Court limited its focus to whether plaintiffs had a valid cause of action and, in a passage cited by Wyatt, declined to allow the parties to "obtain, through the back channel of a judicial ruling . . . what has eluded them so far from national and international discourse in the political and diplomatic arenas." Id. at 429.  (See Wyatt Pre-trial Mem. at 17).

Such concerns are not present in this case.  The Knox court was acutely aware of the parties' attempts to advance their own political agendas and their hopes of securing a judgment that would, for plaintiffs, lay culpability on the PLO and PA for violence in Israel, and for defendants, acknowledge or recognize Palestine as a sovereign state.  Here, there is no such political motivation.  The Government is not purporting to act on behalf of

- 11 -

the Iraqi People or, as Wyatt suggests, sidestepping the
Government of Iraq's sovereign authority over its nationals.  Nor
is the Government asking the Court to recognize the Iraqi People
as having a legal personality separate from the Government of
Iraq.  The Government's wire fraud theory does not require the
Court to make any determinations as to legal "status" that are
more appropriately within the purview of the Executive branch.

I turn to whether the Iraqi People had a valid property
interest in the funds allegedly diverted from OFFP Bank Account
as a result of the Surcharge Scheme.  I conclude that they did.
The monies in the OFFP Bank Account that were to be used to
purchase humanitarian goods were benefits to which the Iraqi
People were entitled.

"In determining whether a given benefits regime creates
a property interest . . . [the Court] look[s] to the statute and
regulations governing the distribution of benefits.  Where those
statutes or regulations 'meaningfully channel[ ] official
discretion by mandating a defined administrative outcome,' a
property interest will be found to exist."  Kapps v. Wing, 404
F.3d 105, 113 (2d Cir. 2005) (internal citations omitted); see
Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 462 (1989); Sealed
v. Sealed, 332 F.3d 51, 56 (2d Cir. 2003).

U.N. Resolution 986 ("Resolution 986"), which created
the Oil-for-Food Program, and the Memorandum of Understanding
between the Government of Iraq and the U.N. implementing the
Program clearly establish the property interest held by the Iraqi

- 12 -

People.  <u>See</u> S.C. Res. 986, U.N. Doc. S/RES/986 (Apr. 14, 1994)
(Bruff Decl. Ex. F); Memorandum of Understanding Between the
Secretariat of the United Nations and the Government of Iraq on
the Implementation of Security Council Resolution 986 ("MOU"),
U.N. Doc. S/1996/356 (May 20, 1996) (Bruff Decl. Ex. H).
Resolution 986 provides that the funds in the OFFP Bank Account
"<u>shall</u> be used to meet the humanitarian needs of the Iraqi
population."  Resolution 986 ¶ 8 (emphasis added).  The
Resolution also asks the Secretary-General of the U.N. to use the
funds in the OFFP Bank Accounts to finance the export of
"medicine, health supplies, foodstuffs, and materials and
supplies for essential civilian needs," provided, <u>inter</u> <u>alia</u>,
that "Iraq effectively <u>guarantees</u> their equitable distribution,
on the basis of a plan submitted to and approved by the
Secretary-General."  <u>Id.</u> ¶ 8(a)(ii) (emphasis added).  The MOU
contains similar language:  "The Government of Iraq undertakes to
effectively <u>guarantee</u> equitable distribution to the Iraqi
population throughout the country of [humanitarian supplies]
purchased with the proceeds of the sale of Iraqi petroleum and
petroleum products."  MOU ¶ 5 (emphasis added).  Section 6 of the
MOU states that "the Government of Iraq shall provide a
Distribution Plan describing in detail the procedures to be
followed by the competent Iraqi authorities with a view to _
<u>ensuring</u> such distribution," which plan was to be submitted and
approved by the Secretary-General.  <u>Id.</u> ¶¶ 6, 8 (emphasis added).

- 13 -

Based on the above provisions, I agree with the Government that Resolution 986 and the MOU "meaningfully channel official discretion by mandating a defined administrative outcome" -- namely, the guaranteed distribution of humanitarian supplies to the People of Iraq.  See Kapps, 404 F.3d at 113.  The imperative language of both Resolution 986 and the MOU required the Iraqi Government to guarantee distribution of humanitarian goods, and this language is sufficient for the Iraqi People as a whole to lay a claim of entitlement to the funds used to buy humanitarian goods under the Program.

Accordingly, the Government may proceed on its theory that the Iraqi People were victims of the Surcharge Scheme.[3]

### c.   **The Oil-for-Food Program**

Defendants likewise argue that the Program cannot serve as a victim of wire fraud.  I disagree.

-----

[3]      The Bayoil Defendants also urge the Court to apply the convergence theory of wire/mail fraud, under which the identity of the party deceived by the fraud and the identity of the party injured must converge.  They argue that the Iraqi People cannot be victims of wire fraud because even if they were deprived of property by the Surcharge Scheme, there is no allegation that defendants deceived them.  The Second Circuit has not adopted a convergence requirement, see United States v. Eisen, 974 F.2d 246, 253 (2d Cir. 1992), and has explicitly held that lack of convergence is not a bar to a claim of wire or mail fraud.  See Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 262-63 (2d Cir. 2004), rev'd in part and vacated in part on other grounds, 126 S. Ct. 1991 (2006).  Furthermore, this Court has at least twice rejected the convergence theory.  See Trautz v. Weisman, 819 F. Supp. 282, 286 (S.D.N.Y. 1993); Shaw v. Rolex Watch U.S.A., Inc., 726 F. Supp. 969, 973 (S.D.N.Y. 1989).  I therefore decline to impose such a requirement.

First, the Program is a part of the U.N.  Both the
Program and the U.N. had the ability to -- and did -- hold
property.  Second, defendants' reliance on Cleveland v. United
States for the proposition that the Program was a mere regulator
over the funds held in the OFFP Bank Account and had no property
interest in those funds is misplaced.  The Program's interest in
the funds held in the OFFP Bank Account was not "purely
regulatory."  The Program had a direct, economic interest in the
monies in the OFFP Bank Account, and indeed, those interests are
reflected in the U.N. documents establishing and implementing the
Program.  Resolution 986, for example, plainly states that the
funds were to be used "to meet the humanitarian needs of the
Iraqi population" and for "other purposes."  Resolution 986 ¶ 8.
The proceeds of oil sales deposited in the OFFP Bank Account were
also to be used to pay war reparations claims against Iraq
stemming from Saddam Hussein's regime, the costs of the
independent inspection agents and accountants whose services were
required to implement the Program, and the costs of U.N. weapons
inspectors in Iraq.  Id.  Additionally, between $130 million to
150 million were to be remitted to the U.N. Inter-Agency
Humanitarian Programme for the purchase and distribution of
humanitarian goods within three specific northern governorates of
Iraq.  Id.  Thus, the Program had a financial interest in the
funds held in the OFFP Bank Account.  In short, the Indictment
sufficiently alleges that the Surcharge Scheme, through its

- 15 -

purported diversion of funds from the OFFP Bank Account, deprived the Oil-for-Food Program of "property."

For the foregoing reasons, defendants' motion to dismiss Count Two is denied.[4]

### 3. Count Three (Engaging in Prohibited Financial Transactions with Iraq) and Count Four (Violation of IEEPA)

Bayoil Supply & Trading Limited ("Bayoil S&T") moves to dismiss Counts Three and Four on the ground that as a Bahamian company, it cannot be subject to liability for the violations of the statutes, and the associated Executive Orders and regulations charged in those counts, for they apply only to "United States persons."  Wyatt moves for dismissal of these counts based on the purported invalidity of the Iraqi Sanctions Regulations (the "Regulations") implementing the Program.

#### a. Bayoil S&T

Count Three charges defendants with violating 18 U.S.C. § 2332d, which makes it a crime for "whoever, being a United States person," to engage in a financial transaction with the government of a country supporting international terrorism.  18

---

[4]     The Bayoil Defendants also argue that the rule of lenity counsels in favor of finding that the Government has not alleged a scheme to deprive the Program or the Iraqi People of "property."  The rule of lenity provides that where there is a "grievous ambiguity or uncertainty in the language and structure [of a statute]," such that "there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." Trapilo, 130 F.3d at 552 n.8 (citations and internal quotations omitted).  There is no ambiguity here, however, that compels the finding urged by the Bayoil Defendants.

U.S.C. § 2332d(a).  The statute defines "United States person" as any United States citizen or national, permanent resident alien, juridical person organized under the laws of the United States, or any person in the United States.  18 U.S.C. § 2332d(b)(2).

Similarly, the Regulations define "United States person" as "any United States citizen; permanent resident alien; juridical person organized under the laws of the United States or any jurisdiction within the United States, including foreign branches; or any person in the United States."  31 C.F.R. § 575.321.  The Executive Orders upon which the Regulations are based contain nearly identical definitions.  See Exec. Order No. 12,722, § 2(h), 55 Fed. Reg. 31,803 (Aug. 2, 1990) ("[T]he term 'United States person' means any United States citizen, permanent resident alien, juridical person organized under the laws of the United States, or any person in the United States."); Exec. Order 12,724, § 3(a), 55 Fed. Reg. 33,089 (Aug. 9, 1990) ("[T]he term 'United States person' means any United States citizen, permanent resident alien, juridical person organized under the laws of the United States (including foreign branches), or any person in the United States, and vessels of U.S. Registration.").

Despite the clear language of these provisions, the Government argues that Bayoil S&T qualifies as "a "United States person" because it conducted its alleged criminal activity "in the United States."  This conclusion rests on the fact that Chalmers, a United States citizen, was the owner and operator of

Bayoil S&T, and the Government's allegation that the illegal transactions were conducted by Bayoil S&T in Texas.

The Government, however, cites no authority to support its conclusion and the Court rejects it.  First, the Supreme Court, in considering the reach of a federal statute imposing economic sanctions on Burma, has interpreted "United States persons" as excluding foreign corporations.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 379 (2000).

Second, while other federal regulations and statutes prohibiting transactions with hostile countries have been crafted so as to make clear that they reach foreign entities, such is not the case here.  For example, Bayoil S&T points to the Cuban Assets Control Regulations, which proscribe certain transactions between Cuba and "any person subject to the jurisdiction of the United States" or "any person within the United States."  See 31 C.F.R. § 515, et seq.  Both categories of persons include corporations, "wherever organized or doing business," that are owned or controlled by United States citizens or residents.  Id. §§ 515.329(d), 515.330(a)(4).  The Regulations and 18 U.S.C. § 2332d, in contrast, do not contain such a definition.

The Government next argues that even if Bayoil S&T is not itself a "United States person," it is subject to liability for aiding and abetting United States persons to violate the law.  On this point, Bayoil S&T points to United States v. Yakou, 428 F.3d 241 (D.C. Cir. 2005), as instructive.  In Yakou, the defendant was an Iraqi citizen who obtained lawful permanent

resident ("LPR") status in the United States.  Without renouncing his LPR status, he moved to Britain and was also granted British citizenship, then returned to Iraq.  Yakou later traveled to the United States and was arrested pursuant to an indictment alleging that in Iraq he and his son, a United States citizen, had arranged for the sale and delivery of armored patrol boats to the Government of Iraq, in violation of the Arms Export Control Act and its implementing regulations.  The District of Columbia Circuit upheld the district court's dismissal of the indictment on the ground that Yakou was not a "United States person" subject to prosecution under the regulations, concluding that he had relinquished his LPR status despite the lack of formal administrative action to that effect.  It then rejected the Government's argument that Yakou could nevertheless be prosecuted under the federal aiding and abetting statute, stating that "[t]he aiding and abetting statute . . . is not so broad as to expand the extraterritorial reach of the underlying statute." Id. at 252.  It further stated that "the congressional choice to limit liability to 'U.S. persons' is highly significant and inconsistent with catching the non-U.S. person who happens to engage in [illegal] activities with a 'U.S. person." Id.  I agree with this analysis.

Accordingly, Counts Three and Four are dismissed as against Bayoil S&T.

b.   **Wyatt**

Wyatt brings two challenges to Counts Three and Four. Both counts, he claims, are premised on the theory that the Surcharge Scheme violated the Regulations promulgated by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") to, among other things, give effect to Program.  Wyatt argues that the Regulations are invalid because (1) they were promulgated in violation of the non-delegation doctrine, and (2) they were based upon an improper extension of a national emergency, in violation of IEEPA.

i.   **Applicable Law**

(a)   **Non-delegation Doctrine**

The non-delegation doctrine is rooted in the constitutional principle that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." Mistretta v. United States, 488 U.S. 361, 372 (1989) (quoting U.S. Const. Art. I, § 1).  Under the doctrine, Congress generally cannot delegate its legislative power to another branch of government, United States v. Frank, 8 F. Supp. 2d 253, 266 (S.D.N.Y. 1998) (citing Mistretta, 488 U.S. at 372), or to any other entity, such as a private party.  Loving v. United States, 517 U.S. 748, 758 (1996) (citation omitted).  Delegation is proper, however, so long as Congress formulates "an intelligible principle to which the person or body authorized to [exercise the

delegated authority] is directed to conform."  <u>Frank</u>, 8 F. Supp. 2d at 266 (brackets in original) (internal citation omitted).

### (b)  **IEEPA**

Congress enacted IEEPA in 1977 to provide the President with certain powers to respond to "any unusual and extraordinary threat" to national security, foreign policy or the economy of the United States that "has its source in whole or substantial part outside the United States."  50 U.S.C. § 1701(a).  Under IEEPA, the President may regulate or prohibit transfers or transactions with certain foreign nations.  <u>Id.</u> § 1702(a)(1)(B).  To trigger this authority, the President must declare a "national emergency" with respect to the threat.  <u>Id.</u> § 1701(b).  In the event of a new threat, the President must declare a new national emergency before exercising his powers in response to that threat.  <u>Id.</u>  If and when a national emergency is declared, the President may also "issue such regulations, including regulations prescribing definitions, as may be necessary."  <u>Id.</u> § 1704.

IEEPA also requires the President to regularly consult with and report to Congress before exercising the authorities granted under the statute and for "so long as such authorities are exercised."  <u>Id.</u> §§ 1703(a)-(c).  Congress may terminate the national emergency by concurrent resolution.  <u>Id.</u> § 1706(b).

### ii.  **Application**

At the outset, the Court notes that the non-delegation doctrine has been used extremely sparingly.  Indeed, the Supreme Court has only twice struck down a statute under the doctrine.

See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935); Panama Ref. Co. v. Ryan, 293 U.S. 388 (1935); see also Murphy ex rel. Estate of Payne v. United States, 340 F. Supp. 2d 160, 180 (D. Conn. 2004) ("[T]he extent to which the non-delegation doctrine remains governing law is in question, insofar as no law has been found unconstitutional under its provisions in 70 years"), aff'd, 427 F.3d 158 (2d Cir. 2005).

In any event, Wyatt's non-delegation argument is unavailing.  Under the Regulations upon which Wyatt relies, it is plain that OFAC -- and not the U.N. alone -- was vested with the authority to determine whether to grant licenses to United States persons seeking to enter into executory contracts with the Iraqi Government for the purchase of Iraqi oil.  As the Government correctly notes, compliance with U.N. guidelines was but one requirement for issuance of a license.  See 31 C.F.R. § 575.522(c).  The Regulations may have incorporated U.N. standards into the licensing scheme, but merely operating against the backdrop of U.N. guidelines does not contravene the non-delegation doctrine.  OFAC retained authority to define the transactions subject to criminal penalty under the Regulations; it did not, as Wyatt suggests, cede its authority to the U.N. Furthermore, as the Government points out, the transactions in which defendants allegedly engaged were barred by other provisions of the Regulations -- provisions that did not involve U.N. authorization or approval.  See 31 C.F.R. §§ 575.201-575.211, 575.526(b).  Even assuming that the provisions of the

Regulations that Wyatt challenges violate the non-delegation doctrine, there were other provisions of the Regulations that prohibited the transactions alleged here.

As for his second argument, Wyatt asserts that the President failed to declare a new national emergency justifying the Oil-for-Food Program, as required by IEEPA, before the Regulations were amended to implement the Program.  By that time, Wyatt reasons, the August 1990 declaration of a national emergency was outdated because the Iraqi occupation of Kuwait had long ended and U.S. foreign policy had shifted to other perceived threats posed by Iraq.  This argument is without merit as well. I am not persuaded that the declaration of national emergency in August 1990 was solely "designed to repel the Kuwaiti invasion" (Wyatt Pre-Trial Mem. at 44), and that it had become stale at the time the Regulations were amended to reflect the establishment of the Program.  Rather, the declaration of national emergency was aimed more broadly at the "policies and actions of the Government of Iraq" that were hostile to the United States.  See Exec. Order No. 12,722.  The national emergency was continued each year until 2004, when it was terminated by President George W. Bush following the removal of Saddam Hussein's regime.  See Exec. Order 13,350, 69 Fed. Reg. 46,055 (July 29, 2004).  During this time, as the Second Circuit recently found, the President complied with his obligations to periodically report to Congress before invoking his authority under IEEPA.  See United States v. Dhafir, 461 F.3d 211, 218-19 (2d Cir. 2006).  Congress did not

terminate the national emergency declared in August 1990 nor did it require the President to declare a new national emergency -- despite the changing conditions in Iraq.

This aspect of Wyatt's motions is therefore denied.

**4.** **Wyatt's Motion to Dismiss Based on Selective and Vindictive Prosecution**

Wyatt next moves for dismissal based on selective and vindictive prosecution.  He contends that he is being prosecuted solely because of his outspoken opposition to U.S. foreign policy with respect to Iraq, including the embargoes against Iraq.  In support of his theory, he points to his longstanding involvement in the Iraqi oil trade, his ties to Iraqi officials in Baghdad, and several "highly publicized" incidents in which he criticized U.S. policy towards Iraq -- all of which he claims made him a target for prosecution.  (Wyatt Pre-trial Mem. at 63).  He asserts that the Government has identified a number of other companies and individuals as having paid surcharges similar to those alleged in the Indictment, and yet, unlike him, they have escaped prosecution.[5]  In the alternative, Wyatt seeks discovery or an evidentiary hearing on these claims.

---

[5]     Specifically, Wyatt points to the preliminary findings of the Independent Inquiry Committee ("IIC"), the committee appointed by U.N. Secretary General Kofi Annan in 2004 to "investigate the administration and management of the Oil-for-Food Programme in Iraq."  http://www.iic-offp.org/about.htm (last visited Feb. 20, 2007).

a.   **Applicable Law**

As an initial matter, a "presumption of regularity" underlies prosecutorial decisions and "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." United States v. White, No. 02 Cr. 1111, 2003 WL 721567, at *2 (S.D.N.Y. Feb. 28, 2003) (citing United States v. Armstrong, 517 U.S. 456, 464 (1996)).  Thus, the standard for proving a selective prosecution claim is a demanding one.  Armstrong, 517 U.S. at 463.  The defendant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose."  Id. at 465 (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)).  To state a claim for selective prosecution, a defendant must make a prima facie showing both:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant], he has been singled out for prosecution, and (2) that the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

United States v. Fares, 978 F.2d 52, 59 (2d Cir. 1992) (citations omitted).

To state a claim for vindictive prosecution, a defendant must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the

- 25 -

charges by another with animus such that the prosecutor could be considered a "stalking horse," and (2) the defendant would not have been prosecuted but for the animus.  United States v. Sanders, 211 F.3d 711, 717 (2d Cir. 2000) (citation omitted).

      **b.**   **Application**

      Wyatt fails to establish the elements of a selective prosecution claim.  First, his allegation that the Government has not indicted other companies and individuals that paid surcharges in contravention of the Program falls short of showing discriminatory effect, for he does not demonstrate how those companies and individuals are "similarly situated" to him.  See Fares, 978 F.2d at 60.  As the Government points out, those companies and individuals may be immune from prosecution for jurisdictional and other reasons.

      Second, Wyatt posits that his selection for prosecution was motivated solely by his criticism of U.S. policies and actions towards Iraq, but offers no credible evidence to support this theory.  Mere speculation that prosecutors were influenced by Wyatt's opposition to U.S. foreign policy is not sufficient to show discriminatory purpose.  See Wayte, 470 U.S. at 610 (rejecting selective prosecution claim where defendant failed to demonstrate that the Government prosecuted him because of his protest activities).  For instance, Wyatt points to a request for assistance, dated September 14, 2005, from the United States Department of Justice to the Central Authority of Switzerland concerning an investigation of Wyatt and possible co-conspirators

in connection with the Program.  (Shargel Affirm. Ex. M).  The request states, in relevant part: "Wyatt developed strong relationships with the Hussein regime.  For example, Wyatt unsuccessfully lobbied the United States Government in 1990 to not join the international military response to the Hussein regime's invasion of Kuwait."  (Id. at 2) (emphasis in original).

Wyatt claims that this statement amounts to an admission by a prosecutor that his advocacy against the Iraq war was a basis to believe he committed a crime, demonstrating the discriminatory purpose of his prosecution.  What Wyatt fails to mention, however, is that the document also details illegal payments to the Iraqi Government made by companies in which Wyatt apparently had a controlling interest.  (See id. at 1).  Thus, contrary to Wyatt's suggestion, the document tends to show that his prosecution was motivated not by a discriminatory purpose, but by probable cause that Wyatt had committed a crime.

Wyatt also fails to state a claim for vindictive prosecution.  He has not provided evidence of genuine animus on the part of the prosecutors assigned to this case, nor can he show that he would not have been prosecuted but for his public criticism of U.S. policies towards Iraq.  At best, the evidence Wyatt offers shows that his opposition to U.S. foreign policy was known to many, including government officials.  The evidence does not, however, show that Wyatt's prosecution was brought on to punish him or to retaliate against him for his views.

Nor is Wyatt entitled to discovery or an evidentiary hearing with respect to his claims.  To merit discovery on a selective or vindictive prosecution claim, see Sanders, 211 F.3d at 717 (same standard applies to requests for discovery on selective prosecution and vindictive prosecution claims), a defendant must present at least "some evidence tending to show the existence of the essential elements of the defense and that the documents in the government's possession would indeed be probative of these elements." Fares, 978 F.2d at 60 (quoting United States v. Berrios, 501 F.2d 1207, 1211-12 (2d Cir. 1974)). The standard is a rigorous one, id., and a "significant barrier to the litigation of insubstantial claims." Armstrong, 517 U.S. at 464.  To obtain an evidentiary hearing, the defendant must "raise a reasonable doubt that the government acted properly in seeking the indictment." United States v. Aviv, 923 F. Supp. 35, 37 (S.D.N.Y. 1996) (citing United States v. Benson, 941 F.2d 598, 611 (7th Cir. 1991)).

Here, the fact that there may be unindicted companies and individuals that paid surcharges in violation of the Program, without any evidence that they are similarly situated to Wyatt, does not warrant discovery.  "Mere assertions and generalized proffers on information and belief are insufficient [to justify discovery]." Fares, 978 F.2d at 59 (citing Berrios, 501 F.2d at 1211).  Likewise, Wyatt's evidence demonstrating that the Government was aware of his views on U.S.-Iraqi relations does not support an order for discovery, particularly because the

- 28 -

evidence also demonstrates that the Government had a good faith basis for prosecuting Wyatt.  See, e.g., Sanders, 211 F.3d at 718 ("To warrant discovery, the defendant must show 'some evidence' of 'genuine animus,' not the mere possibility that animus might exist under the circumstances.").  For these same reasons, Wyatt is also not entitled to a hearing on his claims.

Wyatt's motion to dismiss based on selective or vindictive prosecution is therefore denied, as is his motion in the alternative for discovery or a hearing.

## B.   Motion to Strike Allegations in Count Two Pursuant to the Noerr-Pennington Doctrine

The Bayoil Defendants contend that because the Program and the Iraqi People cannot be "victims," "the only other conceivable basis" for the wire fraud charged in Count Two is that the Bayoil Defendants "lobbied" the U.N. to reduce the O.S.P.  (Bayoil Mem. at 12; see Indictment ¶¶ 17, 19).  They claim that this theory of wire fraud fails as well, on the ground that lobbying the U.N. is protected by the Noerr-Pennington doctrine.  That doctrine immunizes individuals and entities from liability, under certain circumstances, stemming from their petitioning government officials to take official action.  See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657, 670 (1965).  Consequently, the Bayoil Defendants argue that the allegations in Count Two involving any such lobbying should be stricken.  Given the Court's decision on the motions to

dismiss Count Two, the Court does not reach the merits of this argument.

## C.   <u>Motions for Severance</u>

Both the Bayoil Defendants and Wyatt move for separate trials under Rules 8 and 14 of the Federal Rules of Criminal Procedure ("Rule 8" and "Rule 14," respectively).

### 1.   <u>Applicable Law</u>

Rule 8(b) permits joinder of defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  The Second Circuit has interpreted this to mean that joinder is proper when the charged offenses are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." <u>United States v. Stewart</u>, 433 F.3d 273, 314 (2d Cir. 2006) (citing <u>United States v. Attanasio</u>, 870 F.2d 809, 815 (2d Cir. 1989)) (internal quotation marks omitted).

Even where joinder is appropriate under Rule 8(b), a district court may grant severance under Rule 14 if joinder "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a); <u>United States v. Watts</u>, No. 04 Cr. 1277, 2005 WL 2738948, at *3 (S.D.N.Y. Oct. 21, 2005).  While the decision whether to grant severance ultimately rests within the sound decision of the district court judge and is "virtually unreviewable," <u>United States v. Yousef</u>, 327 F.3d 56, 149-50 (2d Cir. 2003), it is well established that "there is a preference,

in the federal system, for the joint trial of defendants who are indicted together." Id. (quoting United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993)).  As this Court has stated,

> [j]oint trials promote efficiency and avoid the inequity of inconsistent verdicts. Furthermore, joint trials prevent the last-tried defendant from gaining an unfair advantage by allowing him to see the prosecution's case before his trial.

United States v. Muyet, 945 F. Supp. 586, 596 (S.D.N.Y. 1996) (internal citations omitted).  The presumption in favor of joint trials is particularly strong when the defendants have been jointly indicted for participation in a common plan or scheme. United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991).

In light of this preference for joint trials, "a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in 'substantial prejudice.'"  United States v. Saad, 380 F. Supp. 2d 286, 288 (S.D.N.Y. 2005) (quoting United States v. Amato, 15 F.3d 230, 237 (2d Cir. 1994)).  Accordingly, a defendant moving for severance must prove "facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial."  United States v. Ramos, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004) (quoting United States v. Burke, 700 F.2d 70, 83 (2d Cir. 1983)) (internal quotation marks omitted).  Indeed, the Supreme Court has instructed that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

about guilt or innocence."  <u>Zafiro v. United States</u>, 506 U.S.
534, 539 (1993); <u>see also</u> <u>Rosa</u>, 11 F.3d at 341 ("The principles
that guide the district court's consideration of a motion for
severance usually counsel denial.").

      2.  **Application**

         Defendants base their severance motions primarily on
the alleged prejudicial spillover that would occur in the event
of a joint trial -- in other words, evidence that would be
inadmissible against one defendant if tried individually could be
introduced in a joint trial -- and the "tenuous at best"
connection between the Bayoil Defendants on the one hand, and
Wyatt and the remaining defendants (the "Wyatt Defendants") on
the other.  The Indictment, defendants claim, charges two
distinct conspiracies -- one involving the Bayoil Defendants, and
the other, the Wyatt Defendants -- and is void of any allegation
that the two groups were working in a concerted manner.  These
arguments are unpersuasive.

         First, severance is not warranted under Rule 8, for
joinder is appropriate where, as in this case, the defendants'
criminal acts are alleged to arise out of a common plan or
scheme.  <u>See United States v. Lech</u>, 161 F.R.D. 255, 256 (S.D.N.Y.
1995) (citation omitted).  As alleged co-conspirators, defendants
here are properly joined under Rule 8.  <u>See</u> <u>United States v.
Jones</u>, 652 F. Supp. 1561, 1564 (S.D.N.Y. 1986) (citing <u>United
States v. Barlin</u>, 686 F.2d 81, 91 (2d Cir. 1982); <u>see, e.g.</u>,
<u>United States v. Vega</u>, 309 F. Supp. 2d 609, 614 (S.D.N.Y. 2004)

- 32 -

(holding that allegation in indictment that defendants conspired "together and with each other" to violate narcotics laws satisfied joinder requirements of Rule 8(b)).

Second, even accepting defendants' assertion that the Indictment alleges two distinct conspiracies, rather than one overarching conspiracy, joinder is appropriate because the alleged criminal acts here are "unified by some substantial identity of facts or participants." See Stewart, 433 F.3d at 314. Both the Bayoil Defendants and the Wyatt Defendants are alleged to have engaged in the same conduct -- paying surcharges to the Iraqi Government to obtain oil allocations that they otherwise would have been prohibited from receiving under the law. Both groups of defendants are also charged with taking similar steps to effect this scheme, including lobbying U.N. officials to lower the O.S.P. Thus, even if two conspiracies were alleged, their overlapping facts, participants, and shared purpose would nevertheless provide a basis for joinder.

Finally, the interest in judicial economy and consistent outcomes favors a joint trial, where, as is likely here, the same evidence would be presented at separate trials of each group of defendants.

Defendants have also failed to make the necessary showing for severance under Rule 14(a). Defendants contend that the length and complexity of this case militate against a joint trial, claiming that the jurors will have difficulty comprehending the transactions at issue and separating the

- 33 -

Government's cases against each defendant.  I am not convinced,
however, that the charges against defendants are so complex as to
warrant separate trials, particularly when the parties are
represented by able counsel.  The evidence introduced at trial
will be voluminous, but there is no reason to believe that the
jury will not be able to fairly evaluate the evidence before it,
apply the relevant legal principles, and make determinations as
to individual guilt or innocence.  Furthermore, the parties have
informed the Court that they expect trial to last eight to nine
weeks, with the Government's case-in-chief occupying six to eight
of those weeks.  This length of time does not warrant severance.
Cf. United States v. Casamento, 887 F.2d 1141, 1152 (2d Cir.
1989) (explaining that where the Government expects its case to
exceed four months it should provide a reasoned basis to support
the fairness of a joint trial).

        Defendants also argue that severance should be granted
because of the danger of prejudicial spillover in cases with
multiple defendants with varying degrees of culpability.  They
have not, however, demonstrated that a joint trial will result in
prejudice amounting to a miscarriage of justice or that such
prejudice could not be alleviated by limiting instructions.  See
Solomonyan, 451 F. Supp. at 650 ("Even where a risk of prejudice
can be shown, the presumption in favor of joinder as a means of
achieving judicial efficiency leads most courts to employ
limiting instructions to cure prejudicial spillover.") (citation
omitted).

- 34 -

For the reasons set forth above, the motions for severance are denied.

**E.   Motions to Compel Pre-trial Disclosure of the Government's Exhibit and Witness Lists**

The Bayoil Defendants ask the Court to require the Government to produce its exhibit and witness lists in advance of trial.  They urge the Court to compel disclosure of (1) a preliminary list of the Government's trial exhibits 45 days before trial and a final list 20 days before trial, and (2) the Government's witness list at least 20 days before trial.

**1.   Applicable Law**

Fed. R. Crim. P. 16 ("Rule 16"), which governs pre-trial disclosure obligations, requires the Government to provide discovery of three categories of documents in its possession or control, including documents that "the [G]overnment intends to use . . . in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E); see United States v. Falkowitz, 214 F. Supp. 2d 365, 392 (S.D.N.Y. 2002).  Such disclosure is not required by statute, however, and courts in this District have differed on whether a district court has the discretion to direct pre-trial disclosure of the Government's exhibit list.  Compare United States v. Nachamie, 91 F. Supp. 2d 565, 569 (S.D.N.Y. 2000) (Scheindlin, J.) ("The clear language of Rule 16(a)(1) . . . does not require the Government to identify which documents fall in each category -- it only requires the production of documents responsive to any category"), with United States v. Giffen, 379 F. Supp. 2d 337,

344 (S.D.N.Y. 2004) (Pauley, J.) (relying, in part, on district court's inherent authority to regulate nature and timing of discovery in ordering government to produce pre-trial exhibit list, in spite of <u>Nachamie</u> decision).

As to pre-trial identification of the Government's witnesses, Rule 16 does not require the Government to provide a list of its witnesses before trial. Fed. R. Crim. P. 16; <u>see</u> <u>United States v. Bejasa</u>, 904 F.2d 137, 139 (2d Cir. 1990). A district court may compel the Government to provide pre-trial disclosure of the identity of its witnesses, however, in the exercise of the court's discretion. <u>See</u> <u>id.</u> A request for such disclosure should not be granted unless a defendant makes "a <u>specific</u> showing that disclosure [is] both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case." <u>Id.</u> (quoting <u>United States v. Cannone</u>, 528 F.2d 296, 301 (2d Cir. 1975)) (emphasis in original). An "abstract, conclusory claim that such disclosure [is] necessary to [the] proper preparation for trial" is not sufficient to warrant pretrial disclosure by the Government. <u>Solomonyan</u>, 451 F. Supp. 2d at 645 (quoting <u>Cannone</u>, 528 F.2d at 301-02) (internal quotation marks omitted).

### 2.   **Application**

In this case, given the large volume of documents produced by the Government thus far, a significant portion of which are in Arabic and have yet to be translated by the Government, and for the reasons stated on the record at the

December 12, 2006 conference, defendants' requests for pre-trial disclosure are reasonable.  The Government is directed to provide a preliminary trial exhibit list and copies of those exhibits to defendants no later than 30 days before trial, and a final list no later than 10 days before trial.  Defendants are ordered to provide a preliminary and final list of their exhibits within the same time period.  Furthermore, defendants have made a sufficient showing that under the circumstances -- in particular, the Government's intention to call foreign witnesses and the concerns raised by defendants at the December 12, 2006 conference -- pre-trial disclosure of the Government's witness list is necessary.  Accordingly, the Government shall produce a list of its witnesses 10 days in advance of trial.

**F.   <u>Wyatt's Motion to Dismiss Count Five</u>**

Wyatt moves to dismiss of Count Five on statute of limitations, improper venue, and non-delegation grounds.  Count Five alleges the following:

> From at least in or about 1994, up to and including in or about March 2003, in the Southern District of New York and elsewhere, Oscar S. Wyatt, Jr., the defendant, a United States person, unlawfully, willfully, and knowingly violated IEEPA, and the regulations promulgated thereunder . . . to wit, without obtaining the required OFAC approval, Wyatt supplied satellite communications equipment and services to the Government of Iraq.

Indictment ¶ 39.

Wyatt first argues that Count Five must be dismissed because it attempts to reach conduct that occurred outside of

- 37 -

IEEPA's five-year statute of limitations period.[6]  In a letter to
the Court dated August 31, 2006, the Government stated that the
additional violation of IEEPA charged in Count Five "relate[d] to
Wyatt's violation of [IEEPA] through the provision of a satellite
communications system to the Government of Iraq from
approximately in or about 1994 through and including in or about
2002."  (Gov't Letter dated Aug. 31, 2006 to the Court; see Wyatt
Mem. Ex. A at 1).  According to the Government, this new charge
was "previewed" in the testimony of Samir Vincent at the trial of
co-defendant Park.  (Id.).  Vincent testified that Wyatt provided
a satellite dish "in the mid '90s, '94, '95 approximately" to
Iraqi officials in Jordan.  (Park Tr. at 224-25 (June 28, 2006);
see Gov't Opp. Ex. A; Wyatt Mem. Ex. B)).[7]  Wyatt claims that the
offense charged in Count Five thus occurred well beyond the
limitations period, as shown by Vincent's testimony at the Park
trial and the dates alleged in Count Five.  He also argues that
to the extent Count Five charges multiple transactions, such

---

[6]    The limitations statute applicable to IEEPA, 18 U.S.C.
§ 3282, provides that "no person shall be prosecuted, tried, or
punished for any offense . . . unless the indictment is found
. . . within five years next after such offense shall have been
committed."  18 U.S.C. § 3282.  An indictment is "found" within
the meaning of the statute when it has been returned by the grand
jury and filed.  United States v. Martinez, No. 94 Cr. 219, 1995
WL 10849, at *1 (S.D.N.Y. Jan. 12, 1995) (citing United States v.
Srulowitz, 819 F.2d 37, 40 (2d Cir. 1987)).  Here, the Indictment
was filed on September 18, 2006, and therefore the five-year
period for statute of limitations purposes began on September 18,
2001.

[7]    References to "Park Tr." are to the transcript of the
trial of co-defendant Tongsun Park, S4 05 Cr. 59 (DC).

charges are improperly duplicitous and cannot be aggregated as a continuing offense.

Count Five's allegations are not limited, however, to Wyatt's provision of a satellite dish.  Indeed, the Indictment alleges that Wyatt provided not only equipment, but also satellite communications services through in or about 2003 -- well within the five-year limitations period.  (See Indictment ¶ 39).  According to the Government, Wyatt paid the regular maintenance costs and service fees for the upkeep of the satellite dish he provided in the mid-1990s.  (Gov't Opp. at 2). The Government contends that Count Five properly charges the provisions of both equipment and services together because they were committed as part of a single scheme to violate IEEPA.

I agree.  Where multiple criminal acts may be characterized as part a single, unified scheme, they may be charged as a single count.  United States v. Moloney, 287 F.3d 236, 240 (2d Cir. 2002) (citing United States v. Margiotta, 646 F.2d 729, 733 (2d Cir. 1981)); see also United States v. Martino, No. 00 Cr. 389, 2000 WL 1843233, at *4 (S.D.N.Y. Dec. 14, 2000) (citing cases).  Here, Wyatt's provision of a satellite dish in the mid-1990s and his subsequent provision of services to maintain that dish are sufficiently related so as to constitute a single continuing scheme, the object of which was to illegally supply Iraq with a satellite communications system.  These acts are thus properly grouped together in Count Five.  See United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989) ("As long as

the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible.") (citation omitted).  Accordingly, I conclude that Count Five is not barred by the statute of limitations.

Wyatt next argues that Count Five improperly alleges venue in this District, thereby compelling dismissal.  The basis of his argument is that the allegation that the charged conduct took place "in the Southern District of New York and elsewhere" (Indictment ¶ 39) is insufficient to support venue because it fails to indicate which specific criminal acts were committed in this District.  See U.S. Const. Art. III, § 2, cl. 3 ("The Trial of all crimes . . . shall be held in the State where the said Crimes shall have been committed"); id. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed"); Fed. R. Crim. P. 18 ("[T]he government must prosecute an offense in a district where the offense was committed.").  Moreover, Wyatt claims that the Government's proffered "preview" -- that he, a Texas resident, purportedly supplied a satellite dish to Iraqi diplomats in Jordan -- shows that the locus of the charged offense is outside this District and, therefore, contradicts Count Five's venue allegation.

Wyatt's challenges are premature.  First, whether there is sufficient evidence to support venue in this District is appropriately left for trial.  See United States v. Szur, No. 97

- 40 -

Cr. 108, 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998).  At that
time, the Government will have to prove venue by a preponderance
of evidence, see id., and the Government has represented that it
will prove additional facts at trial to support the Indictment's
allegation of venue (Gov't Opp. at 9).  See, e.g., United States
v. Peterson, 357 F. Supp. 2d 748, 752 (S.D.N.Y. 2005) (denying
venue motion based in part on government's representation that it
would prove at trial additional facts not specifically asserted
in the indictment that also supported venue allegation).  Second,
the proffered "preview" from the Government does not constitute
the whole of its evidence supporting venue, nor am I convinced
that the venue allegation in Count Five is contradictory to the
remaining allegations of the Indictment.  This aspect of the
motion is thus denied, without prejudice to Wyatt's renewing the
motion at the close of the Government's case at trial.

        Finally, Wyatt repeats the non-delegation argument he
made with respect to Counts Three and Four, maintaining that the
Regulations prohibiting the conduct alleged in Count Five are
premised upon an improper delegation of congressional power.
As discussed above, there is no merit to this argument.

        For the foregoing reasons, Wyatt's motion to dismiss
Count Five is denied.

G.    **Wyatt's Motions for Alternative Relief**

        With respect to Count Five, Wyatt alternatively moves
for severance, a bill of particulars, and to strike reference to

the Iraqi Sanctions Act ("ISA").  These motions are denied as
well.

    **1.**   **Severance of Count Five**

      Wyatt asserts two grounds for severance of Count Five:
first, that Count Five is insufficiently related to the remaining
counts of the Indictment to justify joinder under Rule 8(a); and
second, that discretionary severance under Rule 14 is necessary
to prevent the substantial prejudice that would result from
joinder.  The Court concludes that severance is not warranted on
either ground.

      Under Rule 8(a), joinder of offenses is proper "if the
offenses charged . . . are of the same or similar character, or
are based on the same act or transaction, or are connected with
or constitute parts of a common scheme or plan."  Fed. R. Crim.
P. 8(a).  While Rule 8(a) speaks to joinder of offenses, the
Second Circuit has explained that a motion to sever counts for
improper joinder in a multiple-defendant case must be assessed
under Rule 8(b), which governs joinder of defendants.  See Saad,
380 F. Supp. 2d at 287 (citing United States v. Turoff, 853 F.2d
1037, 1043-44 (2d Cir. 1988); United States v. Papadakis, 510
F.2d 287, 299-300 (2d Cir. 1975)).  The rationale underlying this
mandate is as follows:

        When similar but unrelated offenses are
        jointly charged to a single defendant, some
        prejudice almost necessarily results, and the
        same is true when several defendants are
        jointly charged with a single offense or
        related offenses.  Rule 8(a) permits the
        first sort of prejudice and Rule 8(b) the

> second.  But the Rules do not permit
> cumulation of prejudice by charging several
> defendants with similar but unrelated
> offenses.

Turoff, 853 F.2d at 1043 (quoting Cupo v. United States, 359 F.2d 990, 993 (D.C. Cir. 1966) (footnote omitted)).  As discussed earlier, joinder is permissible under Rule 8(b) when the charged offenses are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme."  Stewart, 433 F.3d at 314.

The gist of Wyatt's severance argument is that the allegations of Counts One through Four center on the Surcharge Scheme that started in mid-2000, while Count Five charges the provision of unrelated satellite communications equipment and services some five years earlier.  Wyatt argues that there is no factual or temporal nexus between Count Five and the other counts of the Indictment to support joinder.  The Government, on the other hand, contends that the purpose and effect of the violations charged in Count Five were ultimately to facilitate the crimes charged in Counts One through Four.  For instance, the Government intends to show at trial that Wyatt and Iraqi officials used the satellite communications system he provided to communicate with officials at the U.N. to advance the Surcharge Scheme.  Wyatt also purportedly used his provision of this system as a bargaining chip with the Iraqi Government during negotiations over his obligations under the Surcharge Scheme.

Here, in view of the above representations by the Government, joinder is proper.  Both the Surcharge Scheme and the

violations charged in Count Five were connected by the common
motivation to secure favorable standing with the Iraqi Government
for the purpose of receiving oil allocations.  The Court also
declines to exercise its discretion to sever Count Five under
Rule 14.  Wyatt claims that Count Five carries with it a "unique
prejudice" because it implies that he may have provided
communications capability and improved technology to Iraq for
military purposes, a country with which the United States is
currently in combat -- a charge that he suggests will immediately
prejudice him in the eyes of a jury.  This speculation does not
amount to a showing of the "substantial prejudice" required for
severance.  See Saad, 380 F. Supp. 2d at 288.

### 2.  **Bill of Particulars**

Wyatt next moves under Fed. R. Crim. P. 7(f) for a bill
of particulars specifying, at a minimum: (1) the dates on which
he allegedly provided satellite communications equipment and
services to the Government of Iraq, and (2) the events relating
to such provision that give rise to venue in the Southern
District of New York.  The Government opposes the motion on the
same grounds as its rebuttal of Wyatt's venue challenge.

The legal standard for granting a bill of particulars
is set forth in the Court's Opinion of January 25, 2006.  See
Chalmers, 410 F. Supp. 2d at 283.  Applying that standard here,
the Court denies the request.  The Government has identified, on
more than occasion, the satellite communications equipment that
Wyatt is alleged to have delivered to Iraqi officials and the

period during which that delivery took place. (See, e.g., Gov't Opp. at 2). In its opposition papers, the Government clarified that the satellite communications services that Wyatt purportedly provided were those rendered in connection with maintaining that equipment, and it provided specific examples of relevant documents provided in discovery. (See id. at 2-3). Wyatt has been provided with sufficient information to effectively defend against the charges in Count Five.

### 3.   Motion to Strike Reference to the ISA

Counts Four and Five, in their parenthetical citations to the applicable statutes and regulations, refer to section 586E of the Iraqi Sanctions Act. (Indictment ¶¶ 38, 39). Wyatt asks the Court to strike these references as surplusage because the Indictment does not charge a violation of the ISA. He argues that the references are confusing and could be read as charging a violation of the ISA, thus subjecting him to double jeopardy, as IEEPA -- violations of which are charged in the Indictment -- criminalizes the same conduct as the ISA. This argument is unfounded. As the Government notes, the section of the ISA referenced in Counts Four and Five does not charge a separate offense, but simply prescribes an enhanced penalty for IEEPA violations of the Iraqi trade embargo. The motion to strike is therefore denied.

### CONCLUSION

For the foregoing reasons, defendants' motions are denied, except that: (1) Bayoil S&T's motion to dismiss Counts

Three and Four is granted; and (2) defendants' motions for pre-
trial disclosure of the Government's exhibit and witness lists is
granted.

      SO ORDERED.

Dated:    New York, New York
          February 22, 2007

                        DENNY CHIN
                        United States District Judge

**<u>APPEARANCES</u>**


For the United States:

        MICHAEL J. GARCIA, Esq.
        United States Attorney for the
          Southern District of New York
            By:  Edward O'Callaghan, Esq.
                Stephen Miller, Esq.
                Michael Farbiarz, Esq.
                Assistant United States Attorneys
        One St. Andrew's Plaza
        New York, New York  10003

For Defendant David B. Chalmers, Jr.:

        JENNER & BLOCK LLP
            By:  Andrew Weissmann, Esq.
                Stephen L. Ascher, Esq.
                Harry Sandick, Esq.
        919 Third Avenue
        New York, New York 10022

        STILLMAN & FRIEDMAN, P.C.
            By:  Paul Schectman, Esq.
                Glen Kopp, Esq.
        425 Park Avenue
        New York, New York  10022

For Defendants Bayoil Companies:

        WELSH & RECKER, P.C.
            By:  Catherine M. Recker, Esq.
                Amy Carver, Esq.
        2000 Market Street
        Philadelphia, Pennsylvania  19103

For Defendant Ludmil Dionissiev:

        DECHERT LLP
            By:  David M. Howard, Esq.
                Michael J. Gilbert, Esq.
                Tara L. Cooney, Esq.
        2929 Arch Street
        Philadelphia, Pennsylvania  19104

For Defendant Oscar S. Wyatt, Jr.:

        CANALES & SIMONSON
            By:  J.A. Canales, Esq.

- 47 -

```
P.O. Box 5624
Corpus Christi, Texas  78465

THE PARKER LAW FIRM
     By:  Carl A. Parker, Esq.
1 Plaza Square
Port Arthur, Texas  77642

ROPES & GRAY LLP
     By:  Samuel J. Buffone, Esq.
          Stacy D. Belf, Esq.
One Metro Center
700 12th Street, N.W.
Washington, DC  20005

GERALD L. SHARGEL, ESQ.
570 Lexington Avenue
New York, New York  10022
```