UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA          :

          - v. -                  :     S5 05 Cr. 59 (DC)

DAVID B. CHALMERS, JR.,           :
BAYOIL SUPPLY & TRADING LTD.,
BAYOIL (USA), INC.,               :

              Defendants.         :

- - - - - - - - - - - - - -   x


SENTENCING MEMORANDUM



                         MICHAEL J. GARCIA
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the United States
                              of America


EDWARD C. O'CALLAGHAN
MICHAEL FARBIARZ
Assistant United States Attorneys,
     Of Counsel.

# **Table of Contents**

Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

           A.     The Oil-for-Food Programme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
           B.     The Surcharge Scheme and the Official Selling Price. . . . . . . . . . . . . . . 4
           C.     The Government of Iraq Cuts Off American Companies. . . . . . . . . . . . . 6

    II.    The Bayoil Companies and Dionissiev. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           A.     Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
           B.     Contract M/08/40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    III.    The Bayoil Companies, Giangrandi, and Italtech. . . . . . . . . . . . . . . . . . . . . . 14

           A.     Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           B.     Chalmers' Control Over Italtech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           C.     Contract M/9/07. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
           D.     2002: Chalmers and the Bayoil Companies Attempt To Resolve Their
                 Dispute With SOMO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    IV.    The Bayoil Companies Pay Inflated Commissions to Allocation Holders —
               Who Use the Extra Commissions to Pay the Hussein Regime. . . . . . . . 30

Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

The Guidelines Ranges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

The Factors Set Forth in Section 3553(a) Warrant Guidelines sentences. . . . . . . . . . . . . . . . . 42

           A.     The Nature and Circumstances of the Offense and the History and
                 Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
           B.     The Need for the Sentence Imposed to: . . . . . . . . . . . . . . . . . . . . . . . . . 48
                 1.     Reflect the Seriousness of the Offense, Promote Respect for the
                         Law, and Provide Just Punishment for the Offense. . . . . . . . . . . 48
                 2.     Afford Adequate Deterrence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
                 3.     Protect the Public from Further Crimes of the
                         Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
                 4.     Provide Needed Educational or Vocational Training, Medical Care,
                         or Other Correctional Treatment in the Most Effect Manner. . . . 50
           C.     The Kinds of Sentences Available. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
           D.     The Kinds of Sentence and the Sentencing Range Established [in the
                 Sentencing Guidelines]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      E.     Pertinent Policy Statements [Issued by the Sentencing Commission]. . . . 51

      F.     The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      G.     The Need to Provide Restitution to Any Victims of the  Offense. . . . . . . 52

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA          :

          - v. -                  :      S5 05 Cr. 59 (DC)

DAVID B. CHALMERS, JR.,           :
BAYOIL SUPPLY & TRADING LTD.,
BAYOIL (USA), INC.,               :
          Defendants.
                                  :
- - - - - - - - - - - - - - -   x

## SENTENCING MEMORANDUM

          In advance of the Court's sentencing of David B.
Chalmers, Jr., Bayoil Supply & Trading, Ltd. ("Bayoil SNT"), and
Bayoil (USA), Inc. ("Bayoil USA"), the Government respectfully
submits this Sentencing Memorandum to set forth its view of the
appropriate sentences.

                    *      *      *

          On August 17, 2007, Chalmers pleaded guilty to Count
One of the above-captioned Indictment, pursuant to a plea
agreement ("Chalmers Plea Agreement").  Under the terms of the
Chalmers Plea Agreement, the parties have agreed, among other
things, that: under the United States Sentencing Guidelines
("Guidelines"), Chalmers' sentencing range is a term of
imprisonment of 37 to 46 months and a fine of $7,500 to $75,000;
and a sentence of 37 to 46 months imprisonment would constitute a
reasonable sentence under Title 18, United States Code, Section
3553(a).

On August 17, 2007, Bayoil USA pleaded guilty to Count One of the Indictment, pursuant to a plea agreement ("Bayoil USA Plea Agreement").  Under the terms of the Bayoil USA Plea Agreement, the parties have agreed, among other things, that: under the Guidelines, Bayoil USA's fine range is a fine of $9,016,151.40 to $18,032,302.80; and a fine within that range would constitute a reasonable sentence under Title 18, United States Code, Section 3553(a).

On August 17, 2007, Bayoil SNT pleaded guilty to Count One of the Indictment, pursuant to a plea agreement ("Bayoil SNT Plea Agreement").  Under the terms of the Bayoil SNT Plea Agreement, the parties have agreed, among other things, that: under the Guidelines, Bayoil SNT's fine range is a fine of $9,016,151.40 to $18,032,302.80; and a fine within that range would constitute a reasonable sentence under Title 18, United States Code, Section 3553(a).

In addition, and as set forth in the Chalmers Plea Agreement, the Bayoil USA Plea Agreement, and the Bayoil SNT Plea Agreement, the parties have agreed that the fine to be paid by Bayoil USA and Bayoil SNT should be offset by the fine to be paid by Chalmers.

*     *     *

This Sentencing Memorandum sets forth the Government's view as to the basis of the above-described Guidelines

2

calculations, and the reasons why sentences within the Guidelines ranges are appropriate under Section 3553(a).

**FACTS**

**I.___Background**

    **A.    The Oil-for-Food Programme**

Following its 1990 invasion of Kuwait, comprehensive economic sanctions were imposed on Iraq.

The United Nations Oil-for-Food Programme ("OFFP" or "the Program") was created as an exception to these sanctions. The OFFP ran from 1996 until 2003; it was comprised of a series of thirteen, 180-day units, each of which was called a "Phase." Under the OFFP, the Government of Iraq allocated the right to buy Iraqi crude oil to various entities or people.  The payment for this crude oil — at a United Nations-established price (called the Official Selling Price, or "OSP") — was to be deposited into a United Nations-controlled escrow account at a bank in Manhattan.  The money in the escrow account was used principally to purchase food, medicine, and other humanitarian goods for the Iraqi people.

The premise of this arrangement was that Iraq's vast oil wealth should not be converted into cash — which Saddam Hussein's government could use for whatever purposes it chose, and which would dilute the impact of the comprehensive sanctions that were in place on Iraq.  Rather, under the Program, Iraq's

3

oil wealth would be used to soften the daily sufferings of ordinary Iraqis, who were being harmed by the sanctions imposed on the Hussein regime.

### B.   The Surcharge Scheme and the Official Selling Price

During September of 2000, the Hussein regime began working to circumvent the OFFP, by requiring backdoor cash payments — "surcharges" — from anyone who wanted to buy Iraqi oil under the Program.  These kickbacks were not paid to the United Nations-controlled escrow account in Manhattan.  Rather, surcharge payments were made to the Hussein regime itself — via cash drops at Iraqi embassies, for example, or by conveying money to Iraqi-controlled bank accounts in Jordan or Lebanon.

The Government of Iraq's rule with regard to the above-described Surcharge Scheme was simple: if allocation holders did not satisfy their surcharge obligations, they would not get more Iraqi oil.  As contemporaneous State Oil Marketing Organization ("SOMO") records put it: "[n]o company shall be exempted for any reason."  See Ex. A (GX 151 at MAK415, GX 151-T at MAK415-T); see also, e.g., Ex. B (GX 1001, GX 1001-T) ("this matter [of the required surcharge payments]. . . applies to all companies without exemption for any reason whatsoever").[1]

In order to permit oil purchasers to satisfy their

_____

[1] GX 151, GX 151-T, GX 1001, and GX 1001-T were admitted into evidence as Government Exhibits during the September 2007 trial of United States v. Oscar S. Wyatt, Jr., S5 05 Cr. 59 (DC).

surcharge obligations while still making a profit, SOMO worked systematically to lower the OSP — often by colluding with certain of its oil customers to supply false market information to United Nations officials.  See Tr.[2] 1209:4 - 1210:8 (testimony of Mubdir Al-Khudhair).

The relationship between surcharge payments and the systematic deflation of the OSP was illuminated by an exchange of letters between Russian Federation Energy Minister Alexander S. Gavrin and Iraqi Minister of Oil Amer Rasheed.  The officials' correspondence took place during January of 2001, soon after the Surcharge Scheme got underway.  See Ex. C (correspondence) (SOMO[3] 70284 - 70285, SOMO 70284-T - 70285-T).  Minister Garvin complained to Minister Rasheed about the difficulties associated with Russian companies' satisfying the "additional finance [sic] demands by SOMO," while still being able to turn a profit.  See

---

[2] As used herein, "Tr." refers to the transcript of the September 2007 trial of United States v. Oscar S. Wyatt, Jr., S5 05 Cr. 59 (DC).

[3] Documents that bear the Bates prefix "SOMO" were obtained by the United States from the files of SOMO in Baghdad, Iraq. Prior to the entry of guilty pleas by each of the Defendants, the SOMO documents referenced in this Sentencing Memorandum were admitted into evidence pursuant to the Court's ruling and a Title 18, United States Code, Section 3505 foreign records certification. Documents that bear the Bates prefixes BAYOILUSA, BAY, or SNT were obtained pursuant to a Grand Jury subpoena served on the Bayoil Companies.  Documents that bear the Bates prefixes IT or WM, or no Bates prefix, were obtained through Augusto Giangrandi, an agent of Chalmers and the Bayoil Companies during the pendency of the Surcharge Scheme.

id. at SOMO 70285.  Rasheed responded: "our monthly price mechanisms to the various markets are intentionally reduced to such an extent that [they] leave to our customers, includeing [sic] the Russian companies, a reasonable net margin after meeting the amount requested by SOMO."  See id. at SOMO 70284.

**C.   The Government of Iraq Cuts Off American Companies**

Prior to 1998, the Bayoil Companies[4] participated in direct purchases of millions of barrels of Iraqi oil under the Program.  However, in 1998, for political reasons, the Government of Iraq stopped offering OFFP oil contracts to American companies, with exceptions not relevant here.  See Tr. 1171:24 - 1172:20 (testimony of Mubdir Al-Khudhair).

Chalmers and the Bayoil Companies responded to this ban

---

[4]   In this Sentencing Memorandum, an action of either Bayoil SNT or Bayoil USA is generally referred to as an action of "the Bayoil Companies."  This is because of the extraordinarily close links between Bayoil SNT and Bayoil USA.  Both entities were founded by Chalmers.  See Bayoil USA Pre-Sentence Investigation Report ("PSR") ¶ 61; Bayoil SNT PSR ¶ 61.  Chalmers is the sole director, officer, and shareholder of Bayoil USA, see Bayoil USA PSR ¶ 61, and Chalmers is the sole director, officer, and known shareholder of Bayoil SNT.  See Bayoil SNT PSR ¶ 61.  Bayoil SNT currently has one employee, see id. at ¶ 70, and no subsidiaries, see id. at ¶ 68 — and the primary business of Bayoil USA has been providing services to Bayoil SNT.  See Bayoil USA PSR ¶ 63.  In light of the breadth of the work that Bayoil USA has performed for Bayoil SNT, see Bayoil SNT PSR ¶ 68, Bayoil USA PSR ¶ 63; Bayoil SNT's lack of capacity to perform its own work, as it has no subsidiaries and one employee, see supra; and the entities' close shared connections to Chalmers, see supra; it is fair to conclude that with respect to the OFFP, Bayoil SNT operated through Bayoil USA, and vice-versa, such that, for sentencing purposes, there is no need to distinguish between them.

on direct oil sales by working to obtain Iraqi oil through non-United States entities.  See Bayoil SNT PSR ¶ 28; Bayoil USA PSR ¶ 28; Chalmers PSR ¶ 29.  To do so, Chalmers and the Bayoil Companies intensified their cooperation with (1) co-defendant Ludmil Dionissiev, a Russian-speaking consultant who began working for the Bayoil Companies in 1998; and (2) Augusto Giangrandi, an Italian-Chilean businessman who was a principal of Italtech S.r.L. ("Italtech"), an Italian entity.  See Bayoil SNT PSR ¶ 28, Bayoil USA PSR ¶ 28; Chalmers PSR ¶ 29.

The Defendants' activities with respect to Dionissiev are described in relevant part in Part II below, and the Defendants' activities with respect to Giangrandi and Italtech are described in relevant part in Part III below.

## II.  The Bayoil Companies and Dionissiev

### A.  Background

Dionissiev had long-standing ties to Russian political figures and commercial concerns, and he used these connections to facilitate Chalmers' and the Bayoil Companies' switch from buying oil directly from the Government of Iraq to buying Iraqi oil indirectly, from Russian oil companies.

For example, by letter dated December 15, 1998, the Government of Iraq's Ambassador in Moscow wrote to a "Mr. Z

7

Leader of LDPR."[5]  See Ex. D (letter) (BAYOILUSA 009396).  An English-language translation of the December 15, 1998 letter was retained by one of the Bayoil Companies.  The translation read: "In answer of your ["Mr. Z"'s] letter address[ed] to Mr. Tariq Azis, Deputy Prime Minister of Iraq, I have the honour to convey to you the apology of the Iraqi side that Iraq cannot do any deals with American companies[.]"  See id.

　　　　Soon after definitively learning in the December 15, 1998 letter that the Government of Iraq would not "do any deals with American companies," see supra, Chalmers and the Bayoil Companies began seeking to obtain Iraqi oil allocated to the LDPR (as opposed to seeking to obtain oil directly from the Government of Iraq).  By memorandum dated December 17, 1998, Chalmers wrote to "Vladimir V. Zhirinovsky, The Chief of the LDPR's Faction," and asked Zhirinovsky to send Bayoil — on LDPR letterhead — a signed document assigning to Bayoil an LDPR oil allocation of seven million barrels of Iraqi oil.  See Ex. E (memorandum) (BAYOILUSA 009397).  Chalmers' December 17, 1998 memorandum explained to Zhirinovsky that the details of the assignment could

---

[5] As set forth more fully below, context makes clear that "Mr. Z" is Vladimir Volfovich Zhirinovsky, the Russian legislator and one-time presidential candidate who helped to found the Liberal Democratic Party of Russia ("LDPR"), an ultra-nationalist political party in the then-Soviet Union.

be worked out between "Igor Lebedev"[6] and Dionissiev:  "Ludmil
Dionissiev will call on Decemger [sic] 24, Igor Lebedev to
confirm the details."  For his part, Zhirinovksy wrote to SOMO's
top official, seeking permission to transfer "the allocation that
has been given to me (LDPR)" to a company affiliated with the
Bayoil Companies, in part because of Bayoil's "great efforts . .
. to ease the political and economical sanctions against IRAQ."
Ex. F (letter) (SOMO 16).

        In short, in part by using Dionissiev's connections,
Chalmers and the Bayoil Companies were able to obtain Iraqi oil
from Russian entities, and in particular those associated with
Zhirinovsky — even after American companies were cut-off in 1998
by the Hussein regime from direct contracting under the OFFP.

   **B.   Contract M/08/40**

        OFFP contract M/08/40 was allocated to Zhirinovsky, who
accepted the allocation through a Russian entity generally known
as TNK, from which the Bayoil Companies bought the M/08/40 oil.
See, e.g., Bayoil SNT PSR ¶ 33.  On behalf of the Bayoil
Companies, Dionissiev worked to insure that this oil was lifted.
See, e.g., Ex. G (7/31/00 Dionissiev memo, proposing nominations
of particular oil tankers in light of a then-recent personal
meeting in Moscow between "the allocation holder" and Iraqi

---

        [6] "Igor Lebedev" is apparently Igor V. Lebedev, an LDPR
official and Zhirinovsky's son.

Deputy Prime Minister Tariq Aziz) (BAY 04-1914-16).

After some of the oil allocated under contract M/08/40 had been shipped from Iraq, SOMO officials demanded a surcharge payment. See, e.g., Bayoil SNT PSR ¶ 33. During November of 2000, because this surcharge had not yet been paid, SOMO officials determined not to permit the loading of the Astro Beta — a tanker that the Bayoil Companies had chartered to carry approximately 1.8 million barrels of M/08/40 oil out of Iraq. See id.

Dionissiev prepared various documents — all akin to "talking points" — to be used by Zhirinovsky to explain to SOMO why a surcharge payment should not be required before the Astro Beta was permitted to load. See, e.g., Bayoil SNT PSR ¶ 31.

For example, Dionissiev recommended that Zhirinovsky commit to making a surcharge payment in the future — and that he (Zhirinovsky) link this future commitment to make a surcharge payment to a reduction in the OSP:

> [I]t would not be appropriate to meet the request now
> on a retroactive basis for Phase 8. However, if such
> payments are required for the next 9th phase you
> [Zhirinovsky] are ready to pay a predetermined amount.
> . . . [T]o meet the requested additional premiums, . .
> . it would be recommended to keep the formula prices
> extremely competitive . . . as Phase 9 begins.

Ex. H (BAYOILUSA 009112); see also Ex. I (January 1, 2001 draft letter to "Igor," see supra n.6, that justified the imposition of a surcharge on the Astro Beta cargo, and the Surcharge Scheme

10

more generally — by indicating that compensation for making surcharge payments was "in" the OSP) (BAYOILUSA 011210 - 011212).

In a similar vein, a proposed letter for "Igor," <u>see</u> <u>supra</u> n.6, to send to SOMO over the signature "VV" — that is, Vladimir Volfovich Zhirinovsky — expressed "sympathy with your [the Hussein regime's] request to receive some funds that can be utilized by you outside UN control." Ex. J (BAYOILUSA 015405). But the proposed letter to SOMO noted that "the publicity of your request has reached [an] unprecedented level that prevents any one in entering into a private deal." <u>Id.</u> Furthermore, the proposed letter voiced the complaint that "[t]he rules have changed in the middle of the term," after the onset of Phase 8 — but indicated that "I would consider some different attitude towards future contracts twhen [<u>sic</u>] the conditions will be known from the start." <u>Id.</u>

Another proposed letter for "Igor" to send to SOMO recommended similar arguments: it is "very hard on me and my receivers to reply positively to your request for additional payments for this phase, as the sales are already effected," but, the letter continued, "as I confirmed in Baghdad I shall support your endeavor for any future allocations that may be granted to me." Ex. K (letter) (BAYOILUSA 009108).

In short, Dionissiev, an employee of the Bayoil Companies, advised Zhirinovsky that he (Zhirinovsky) should

commit to making surcharge payments in Phase 9 — so that the Astro Beta would be permitted to leave port loaded with the Phase 8 oil that the Bayoil Companies had purchased.

Dionissiev's advice, however, was unavailing — and through December of 2000, the Astro Beta continued to be held in port, pending payment of a surcharge.  <u>See</u>, <u>e.g.</u>, Ex. L (BAYOILUSA 015284, BAYOILUSA 000303).

Accordingly, Chalmers and the Bayoil Companies switched tactics — from Dionissiev advising Zhirinovsky to promise to make a surcharge payment on future oil shipments, to using Giangrandi to promise to make a surcharge payment on the M/08/40 oil shipment itself.

By letter dated January 1, 2001, Giangrandi wrote to SOMO.  Giangrandi's letter stated: "[s]ince the problem . . . has not yet been worked out with the allocation owner to the satisfaction of both parties . . . , we reluctantly agree to bear the necessary responsibility in order to help solve this problem."[7]  Ex. M (letter) (SOMO 000257).

By memorandum dated January 4, 2001, SOMO thanked Giangrandi for his January 1 letter — and indicated that "in response to your agreement within [<u>sic</u>] our arrangement, we shall

---

[7] Giangrandi has told the Government that this January 1, 2001 promise to pay was made at the direction of Chalmers, and that Chalmers personally supplied Giangrandi with some of the quoted language.

commence to load MT (Astro Beta) as soon as L/C [letter of credit] amendment is received." Ex. N (memorandum) (SOMO 78141). This document was sent to the Bayoil Companies on January 5, 2001. See Ex. O (January 4, 2001 SOMO memorandum to Giangrandi, see Ex. N, obtained from Italtech's files and bearing a handwritten Italian notation in the lower right-hand corner that indicates that the January 4, 2001 SOMO memorandum was sent to Bayoil) (IT 00421).

In the days immediately following the January 1, 2001 commitment to make a surcharge payment, events moved quickly. Chalmers prepared a January 3 memorandum to spur the loading of the Astro Beta, and one of the Bayoil Companies initiated a request on January 3 for an amendment to the letter of credit, see Ex. P (BAYOILUSA 00302, SOMO 78235) — as SOMO had indicated, see supra Ex. N, would be a precondition to lifting the oil.  In addition, Dionissiev conveyed to Zhirinovsky that a promise to pay the M/08/40 surcharge had in fact been made and that the Astro Beta would be loaded and could leave port, as Dionissiev admitted during his guilty plea allocution.  In light of these actions — central to which was the commitment to pay a surcharge — approximately 1.8 million barrels of oil were shipped from Iraq.[8]

_____

[8]  As discussed more fully below, during 2001, Giangrandi paid for the M/08/40 surcharge obligation by giving Iraqi officials in Baghdad a series of personal checks made out to Al-

### III._The Bayoil Companies, Giangrandi, and Italtech

#### A.   Background

During the mid-1980s, at the height of the Iran-Iraq War, Augusto Giangrandi supplied weapons to the Hussein regime.[9] The Government of Iraq paid Giangrandi for these weapons in oil, not cash — but Giangrandi knew little about the petroleum business.  Accordingly, Giangrandi obtained quotes from various oil companies as to what those companies would charge to transport and help sell the Iraqi oil that Giangrandi was receiving.  The lowest quote was from Chalmers, then a co-owner of an entity called Carey Oil.  Chalmers worked to help transport and sell the Iraqi oil that Giangrandi was receiving — and Chalmers did so until the 1990 invasion of Kuwait, when the imposition of comprehensive United Nations economic sanctions led to a cut-off of all Iraq oil exports.

After sanctions were imposed, Chalmers sought to stay involved in the Iraqi oil industry, so that he would be well-positioned when normal trading resumed.  To this end, Chalmers conveyed information on global petroleum markets to the

------

Wasel and Babel, a Government of Iraq front company; these checks, however, were not ultimately deposited by Al-Wasel and Babel.

[9]  The information set forth in this Background section is based largely on information provided to the Government by Giangrandi, and is reflected in Federal Bureau of Investigation reports first provided to the Bayoil Defendants during 2006.

Government of Iraq.  Similarly, Chalmers asked Giangrandi to stay in touch with Iraqi oil officials, and paid Giangrandi approximately $40,000 a month for his services.

With the onset of the OFFP, the Bayoil Companies received contracts for hundreds of millions of dollars worth of oil.  However, this arrangement was jeopardized by the Government of Iraq's 1998 cut-off of direct sales to United States companies — and so, as noted above, Chalmers and the Bayoil Companies intensified their cooperation with Giangrandi and with Italtech.

**B.   Chalmers' Control Over Italtech**

Chalmers and the Bayoil Companies provided a great deal of financial support to Italtech.  See, e.g., Ex. Q (July 2000, September 2000, and October 2000 bank guarantees) (SNT 033085-88, 033684-86, 033820-23).  More particularly, the Bayoil Companies funded the core aspects of the work that Italtech did to procure Iraqi oil.  For example, Italtech invoiced the Bayoil Companies for: Italtech's registration with the United Nations in connection with the OFFP, see Ex. R (IT 597); the maintenance of various Swiss bank accounts used by Italtech to make payments for Iraqi oil, see, e.g., Ex. S (IT 1556, IT 1559); and the services of an Italtech employee in Iraq, see Ex. T (IT 1612).  See generally Ex. U (October 2000 Italtech memorandum indicating that Italtech was to receive $1 million from SNT for the sole purpose of buying Iraqi oil — and any money that Italtech received from

15

the sale of Iraqi oil belonged to Bayoil SNT) (BAYOILUSA 14782).

Because of the substantial funding that they provided, Chalmers and the Bayoil Companies exercised close control over Italtech's Iraqi oil operations.  Accordingly, Chalmers provided close, fine-grained directions to Giangrandi with regard to Italtech's participation in the OFFP.  See, e.g., Ex. V (extended October 2000 memo from "DC" to Italtech, titled "Priorities" that provided guidance with regard to dealing with SOMO) (BAYOILUSA 14776-77).

Similarly, the Bayoil Companies routinely prepared basic documents for Italtech — such as Italtech's Board of Directors resolutions, and a document that placed an Italtech Swiss bank account under the control of one of the Bayoil Companies.  See, e.g., Ex. W (July 1999 facsimile from an employee of the Bayoil Companies conveying an Italtech Board of Directors resolution: "Attached Resolution format should cover opening the accounts and Augusto having power to sign relevant papers.  Please prepare and have signed by all relevant directors asap.") (IT 2422-23); Ex. X (December 1999 electronic mail from an employee of the Bayoil Companies, attaching a document from Italtech to a European bank that places Italtech's bank account under SNT's sole control, and asking that the document be "URGENTLY" printed on Italtech's letterhead) (IT 695-97); see also, e.g., Ex. Y (May 2000 facsimile from an employee of the

16

Bayoil Companies conveying various unsigned documents, under a cover sheet that reads, in part: "Please fax to Iraq, reprint on letterhead and express to Augusto in Geneva.") (IT 2278-80); Ex. Z (November 2001 electronic mail from an employee of the Bayoil Companies conveying a letter to be sent — by Italtech — to the United Nations Oil Overseers regarding the destination of a particular petroleum cargo) (BAYOILUSA 4199-4201).

Indeed, a former employee of the Bayoil Companies has told the Government that the Bayoil Companies maintained a signature stamp in Houston so that Giangrandi could "sign" documents. <u>Cf.</u> Ex. AA (November 2000 facsimile from an employee of the Bayoil Companies to an employee of Italtech in Italy: "grateful if you could please e-mail me the Italtech letterhead") (IT 2342-43).

In short, Chalmers and the Bayoil Companies funded Italtech and exercised substantial control over it.  The Defendants did not invest in Italtech because Italtech or its principals had any substantial knowledge of, or experience in, the global petroleum industry — Italtech was a marine engineering firm, <u>see</u> Ex. BB (Italtech articles of association) (IT 1765-71), whose key principals, Giangradi and an Italian businessman named Lucio Moriconi, knew little about the oil business.  <u>See</u>, <u>e.g.</u>, Ex. CC (Moriconi fax to an official of the Bayoil Companies, in connection with a letter of introduction that Italtech had been

asked to prepare: "I need to create something in the field of the oil, where we are NOT really experts.  For sure you have something similar for Bayoil adaptable to Italtech.  Please send me a draft.") (IT 758); Ex. DD (April 2001 electronic mail to Giangrandi from an employee of the Bayoil Companies explaining to Giangrandi how to register with the United Nations to get an oil allocation) (BAYOILUSA 389).

Rather, the Defendants funded and controlled Italtech because it gave them a vehicle through which they could obtain Iraqi oil (even after American companies were cut off from participating in the OFFP) — and, after the onset of the Surcharge Scheme, Italtech gave the Defendants something else, as well: a way to make surcharge payments to the Hussein regime.[10]

### C.   Contract M/9/07

Toward the end of 2000, as the Ninth Phase of the OFFP began, Iraqi oil exports ground to a complete halt.  See, e.g., Bayoil SNT PSR ¶ 32.  The Surcharge Scheme had recently gotten

---

[10]   Control over Italtech also helped Chalmers and the Bayoil Companies to obtain Iraqi oil from business entities that, like the Government of Iraq, might not be inclined to deal directly with a United States entity.  See, e.g., Ex. EE (July 2000 handwritten letter from Giangrandi to Chalmers: "[c]ontact him [a potential oil supplier] on behalf of Italtech (never Bay)") (IT 109-111); Ex. FF (September 2000 letter from Giangrandi, writing to a potential supplier on the letterhead of one of the Bayoil Companies: "We can contract with you under our Bay Oil Company from Nassau — Bahamas with main office in Houston — Texas.  Or we can contract with you through our Italian affiliate Italtech S.r.l. Co., which ever you prefer.") (IT 100).

underway, and established oil companies refused to buy Iraqi oil while the Hussein regime was requiring that its customers pay illegal commissions.  See id.

With exports stalled, during December of 2000 the Government of Iraq allocated a massive quantity of oil to Italtech.  See, e.g., Bayoil SNT PSR ¶ 32.  At a meeting in Baghdad during December of 2000, Giangrandi was told by the Hussein regime's Minister of Oil, Amer Rasheed, that this large Italtech allocation — for 25 million barrels of oil, under OFFP contract M/9/07 — would  "open[] the gates," and convince other companies to re-enter the Iraqi crude market.  See e.g., Chalmers PSR ¶ 33; Bayoil SNT PSR ¶ 32; Bayoil USA PSR ¶ 32 see also, e.g., Ex. GG (internal SOMO record showing that Italtech's Phase Nine allocation was intended to breach the "psychological barrier" that was preventing other customers from buying Iraqi oil) (SOMO 2344, SOMO 2344-T).

Giangrandi was directly involved in negotiating the M/9/07 allocation, and he had previously been told — elliptically, but unmistakably — that Iraqi oil could not be lifted during December 2000 unless surcharge obligations were satisfied.  Compare, e.g., Ex. HH (November 26, 2000 SOMO memorandum to Giangrandi, regarding oil contract 8/116, a separate oil contract purchased by Italtech on behalf of the Bayoil Companies during Phase 8 of the OFFP: "Please be advised

19

that loading in December 2000 will not be permitted unless the requested payment will take place before loading.") (IT 425) <u>with</u> Ex. II (December 9, 2000 SOMO memorandum to Giangrandi, "Re: Loading in December 2000": "We refer you to our faxed letter . . . of Nov. 26th.") (IT 00015); <u>see</u> <u>generally</u> Ex. JJ (SOMO record describing what was agreed upon at Giangrandi's December 2000 meeting in Baghdad: "the company will pay the surcharge at a later time") (SOMO 2344, SOMO 2344-T).

Italtech's Phase M/9/07 oil was lifted during late December of 2000, and sold to the Bayoil Companies. <u>See</u> Bayoil SNT PSR ¶ 32. However, Italtech did not promptly satisfy its M/9/07 surcharge obligations, and SOMO — well aware that Chalmers controlled Italtech, <u>see</u> <u>supra</u> — invited both Chalmers and Giangrandi to Baghdad. <u>See</u> Ex. KK (January 14, 2001 telex from SOMO to the Iraqi embassy in Amman, Jordan, requesting the issuance of entry visas for Giangrandi and "David Bay") (SOMO 256).

Giangrandi, but not Chalmers, ultimately made the trip, during March of 2001. At a series of meetings with SOMO officials in Baghdad on March 10, 11, and 12, 2001, it was agreed that Giangrandi would satisfy the surcharge obligations associated with contract M/9/07, as well as the surcharge obligations incurred in connection with contract M/8/40. <u>See</u> Ex. JJ. Giangrandi, it was agreed, would satisfy these surcharge obligations by providing personal checks to Al-Wasel and Babel, a United Arab Emirates

20

company that functioned as a Government of Iraq front company.  See id.; see also, e.g., Ex. LL (internal SOMO record of meeting) (SOMO 2350-51, SOMO 2350-T - 2351-T); see generally, e.g., Bayoil SNT PSR ¶ 36 (describing Al-Wasel as an "Iraqi front company"); Ex. MM (record of meeting at SOMO indicating that Al-Wasel and Babel officials would not initiate litigation to recover on a debt owed to SOMO, that was to be paid to Al-Wasel, because a lawsuit "could be risky . . . to . . . the possibility of revealing their [Al-Wasel's] relationship with Iraq") (SOMO 240-241, SOMO 240-T - 241-T).

In accord with this agreement, Giangrandi gave 17 personal checks to SOMO officials in Baghdad, with the understanding that these checks would be hand-carried to the United Arab Emirates and deposited into an Al-Wasel and Babel bank account there.  See, e.g., Ex. LL; Ex. NN (list of checks provided during March of 2001, in Baghdad, to satisfy surcharge obligations) (SOMO 2349); Ex. OO (same) (WM 237); Ex. PP (receipt, given to Giangrandi, that evidenced payment of 17 personal checks to SOMO) (SOMO 2354, SOMO 2354-T).

After handing over the checks, Giangrandi left the Middle East and traveled to the United States — and became concerned about the possible consequences of his making illegal surcharge payments. On March 18, 2001, Giangrandi sought to stop payments on the checks that he had handed over in Baghdad.  See Ex. QQ (March 18, 2001

letter, faxed from Florida, seeking to stop payments on checks) (WM 234). However, this attempt failed. See Ex. RR (March 20, 2001 facsimile from a representative of Al-Wasel and Babel to Giangrandi: "please note we send [sic] your request for delay in deposit of for cheques for clearance to Somo for their acceptance. We regret to inform you that your request has been declined and we have instructions to deposit the cheques each on due date.") (WM 231).

Giangrandi then met with attorneys at the Miami offices of the law firm Hunton and Williams. By letter dated March 21, 2001, the attorneys advised Giangrandi that if he made a surcharge payment, he would be regarded as participating in a criminal conspiracy with Bayoil SNT. See Ex. SS (opinion letter) (23-34).

Giangrandi has explained to the Government that he took the Hunton and Williams opinion letter to Houston to show Chalmers. Giangrandi has further explained that Chalmers told Giangrandi that he had no need to see the letter — because, Chalmers explained, he already knew what it said.

On March 27, 2001, SOMO officials met in Baghdad to discuss how to proceed — Giangrandi was now telling SOMO officials that there was insufficient money in his bank account to cover the 17 personal checks he had written, and that these checks would bounce. At the March 27, 2001 meeting, SOMO officials decided that, because the M/9/07 surcharge obligation had not been

22

satisfied, no more oil would be allocated to Italtech.  See Ex. MM
(record of meeting). Understanding that the real party in interest
when it came to Italtech was Chalmers, SOMO officials contacted
Chalmers himself to apprise him of their decision:

> Mr. David from B Oil Company was informed also by phone;
> to stop the loading until ITALTECH Company fulfill their
> obligations towards us, and inviting him to visit Iraq to
> discuss the matter.

Id.

SOMO's cut-off of Italtech was bad news for Chalmers and
the Bayoil Companies, and by early April of 2001 Chalmers and
Giangrandi were meeting in Geneva to work out a way to satisfy the
Hussein regime's surcharge demand, and to get Iraqi oil flowing
again.  In Geneva, Chalmers was given a summary of Italtech's Phase
8 and Phase 9 dealings with SOMO.  See Ex. TT (summary document
conveyed to Chalmers in Geneva) (BAYOILUSA 8922).

To pay Italtech's surcharge obligations on this oil,
Chalmers directed that payments be made from a bank account of the
Bayoil Companies to Italtech.  See, e.g., Ex. UU (additional April
4, 2001 Chalmers request for payment to Italtech) (BAYOILUSA 9624);
Ex. VV (April 4, 2001 Chalmers request for payment to Italtech)
(BAYOILUSA 9625-26); see also, e.g., Ex. WW (April 18, 2001
Chalmers request for payment to Italtech) (BAYOILUSA 9623); Ex. XX
(related payments to Italtech from the Bayoil Companies) (IT 898,
IT 899, IT 904, IT 909 - IT 911).

In turn, Italtech paid Al-Wasel and Babel, see, e.g., Ex.

YY (IT 896-97, IT 915-16, IT 894-95); Al-Wasel reported back to SOMO that the payments had, in fact, been made, see Ex. ZZ (SOMO 86659); and SOMO booked surcharge payments in its database.   See Ex. AAA (excerpts from the SOMO database, which database was admitted as GX 5000 during the September 2007 trial of United States v. Oscar S. Wyatt, Jr., S5 05 Cr. 59 (DC)).

Ultimately, "CHALMERS and the BAYOIL COMPANIES advanced approximately $9,016,151.40 to Giangrandi and Italtech, who then forwarded that money to Al Wasel & Babel to hide the defendants' connection to the payments."  Chalmers PSR ¶ 37.  It was understood that the Defendants' payments to Italtech were being made to satisfy surcharge obligations, and that these payments would make their way into the hands of the Hussein regime.   See Ex. BBB (Chalmers August 17, 2001 guilty plea transcript) at 18:10-19:19; see also, e.g., Ex. CCC (September 22, 2001 letter from an Italtech employee to an employee of the Bayoil Companies, attaching a summary of the activity in an Italtech bank account, which summary shows (a) payments into the Italtech bank account from one of the Bayoil Companies and (b) payments out of the Italtech bank account to Al-Wasel) (IT 582-83); compare also, e.g., Ex. DDD (April 5, 2001 memorandum from the Bayoil Companies to Giangrandi in Geneva that enumerated Phase 9 payments that had been made) (BAYOILUSA 10776) with Ex. EEE (description of Italtech invoices to the Bayoil Companies, broken down by Phase, that enumerated the precise

24

payments listed in the April 5, 2001 memorandum, <u>see</u> Ex. DDD, and recorded them as "Crude Purchase Al-Wasel") (BAYOILUSA 894).

The above-described surcharge payments — from the Bayoil Companies to Italtech to Al-Wasel — were not made quickly enough for SOMO, which decided during early April of 2001 that it would no longer supply oil to Italtech because of its surcharge delinquency. <u>See</u> Bayoil SNT PSR ¶ 38.

In response to this oil cut-off, Chalmers prepared a letter dated April 12, 2001 to the Iraqi Minister of Oil, which letter was to be hand-carried to SOMO by Chalmers' co-defendant, Oscar S. Wyatt, Jr. <u>See</u> Ex. FFF (April 12, 2001 Chalmers letter) (SOMO 8). In the letter, Chalmers emphasized that the Bayoil Companies had remained in the Iraqi oil market during December of 2000 and January of 2001 "while other lifters backed off," <u>id.</u> — that is, while other entities declined to lift Iraqi oil because surcharges had been imposed. <u>See supra</u>. Chalmers also complained in the letter that SOMO's cut-off of Italtech was taking place just as he had hit upon a "price mechanism" (paying Italtech so Italtech could pay Al-Wasel) that "covered SOMO's standard terms and conditions" (the surcharge requirement). Ex. FFF. In his letter, Chalmers also indicated that he was aware of the substance of Giangrandi's interactions with SOMO, and emphasized that the Bayoil Companies were closely tied to Italtech. As Chalmers put it: "Admittedly, our supplier's [Giangrandi's] return trip and

associated responsibilities [surcharge payments] had been delayed longer than expected.  However, under the circumstances relayed to you, and in consideration of Bayoil's long term health and welfare, such a short delay allowing our supplier to make arrangements properly, should not have resulted in such disastrous consequences for Bayoil, particularly given our history."  Ex. FFF.

### D.   2002: Chalmers and the Bayoil Companies Attempt To Resolve Their Dispute With SOMO

Chalmers' letter was unavailing, and in light of the events of December 2000 through April 2001, Chalmers could not expect to continue to obtain Iraqi oil through Giangrandi and Italtech.  Giangrandi had not kept his promises to satisfy surcharge obligations incurred under OFFP contracts M/8/40 and M/9/07 — and SOMO was not about to forget these obligations.  See, e.g., Ex. GGG (telex from SOMO, seemingly from 2002, that indicated that SOMO was still awaiting satisfaction of surcharge obligations associated with, among others, contract M/9/07) (SOMO 229); Ex. HHH (1/24/02 fax from Al-Wasel and Babel executive to a principal of Italtech, attaching the schedules given to Giangrandi in Baghdad during March of 2001 that delineated various surcharge obligations) (WM 17-20).

All of this presented a substantial problem for Chalmers. It was widely understood that Italtech and Giangrandi were acting for Chalmers, see supra, and Chalmers hoped to maintain a positive

relationship with SOMO, to facilitate future, post-OFFP commercial deals.  See, e.g., Ex. III (BAY04-00068-69).  But this was difficult while Chalmers' agents — Giangrandi and Italtech — were not in SOMO's good graces, having failed timely to satisfy their surcharge obligations.  Accordingly, during 2002, Chalmers, the Bayoil Companies, and their co-conspirators sought to resolve their difficulties with SOMO in two sets of ways.

First, during 2002, Zhirinovsky wrote to Iraqi Deputy Prime Minister Tariq Aziz to indicate that he (Zhirinovsky) had undertaken fully to satisfy the January 1, 2001 surcharge commitment made in connection with OFFP contract M/8/40.  (That surcharge commitment had been made by Giangrandi at the direction of Chalmers.  See supra.)  Zhirinovsky's letter was edited to obscure the role of the Bayoil Companies in connection with contract M/8/40.  Compare Ex. JJJ (March 1, 2002 draft Zhirinovsky letter to "TA," carbon-copied by hand to "Bayoil/Italtech") (WM 200 - 201) with Ex. KKK (March 12, 2002 Zhirinovsky letter to "Tariq Aziz," not carbon-copied to any entity) (WM 67 - 68).  But the message of the letter was plain enough — because Zhirinovsky had undertaken to pay the M/8/40 surcharge obligation, the failure fully to satisfy that obligation should not be laid at the feet of the Bayoil Companies — even though it was the Bayoil Companies' agent, Giangrandi, who had agreed to make the M/8/40 surcharge payment.  See Ex. KKK.

27

Second, Chalmers directed Giangrandi to return to Baghdad. This trip was repeatedly delayed. See, e.g., Ex. LLL (9/23/01 Chalmers memorandum to Minister of Oil, indicating that Giangrandi has been sick but would return to Baghdad soon: "I am confident that this aforementioned trip can lead to a renewed basis for a broad based cooperation . . . .") (BAYOILUSA 15140). But the agenda of the trip — reflected in numerous directives to Giangrandi — did not vary: to propose a kind of grand bargain, whereby outstanding surcharge obligations to SOMO would be satisfied and, in exchange, SOMO would assist the Bayoil Companies in recouping some of the "demurrage" costs the Bayoil Companies had incurred.[11] See, e.g., Ex. MMM (March 2002 electronic mail communications from an employee of the Bayoil Companies that, among other things, conveyed to Giangrandi, "tables for quick reference of demurrage claims") (BAYOILUSA 4657 - 4661, BAYOILUSA 4672 - 4674, WM 202 - 210); Ex. NNN (May 2002 Chalmers memorandum to Giangrandi, which includes a "[s]ummary of discussions points for meeting/s" focused on a resolution of the demurrage claims, and which attached, among other things, a memorandum that concerned possible future business opportunities with the Hussein regime, including buying aircraft from Iraq or obtaining up to 12 million barrels of oil per month for "Bayoil or affiliate") (BAYOILUSA 15002-19); cf. Ex. OOO

---

[11]  Demurrage costs are those costs incurred by lifters of oil when their tankers are forced to sit idle at port, waiting to load their tanks with oil or to leave port.

(undated document titled "Priority — AG Travel Package," that sets forth an agenda for Giangrandi to follow in his dealings with SOMO, including information on what should be said with respect to certain demurrage claims) (BAYOILUSA 4619-20).

During July of 2002, Giangrandi traveled to Baghdad, and, in connection with that trip, prepared a July 21, 2002 letter addressed to the Iraqi Minister of Oil. See Ex. PPP (July 2002 Giangrandi letter) (WM 29-31). The July 2002 letter was addressed from Giangrandi, who was listed as being associated with both Italtech and Bayoil SNT. See id. at WM 29. The letter described prior surcharge payments that had been made, and the fact that Zhirinovsky had "solved the [M/8/40] problem with S.O.M.O." Id. The letter also proposed a resolution of the difficulties caused by delinquent surcharge payments. Giangrandi suggested that, among other things, one million dollars would be paid to SOMO — and in exchange, SOMO would assist Bayoil SNT to perfect its demurrage claims; and SOMO and Bayoil SNT would share, 70%/30%, any demurrage proceeds obtained by Bayoil SNT. See id. at WM 30, 31; see also Ex. GG (internal SOMO record documenting Giangrandi's July 2002 meeting in Baghdad) (SOMO 2344).

Ultimately, the various 2002 efforts to smooth things over with SOMO came to naught — after April 2001, Italtech did not again get oil from Iraq. However, while these 2002 efforts were underway, Chalmers and the Bayoil Companies did not sit idly;

29

rather, as descried more fully below, they remained deeply involved in the Iraqi oil market.

## IV. The Bayoil Companies Pay Inflated Commissions to Allocation Holders — Who Use the Extra Commissions to Pay the Hussein Regime[12]

As noted above, in light of Italtech's surcharge delinquencies, after April 2001, Chalmers and the Bayoil Companies could not reasonably expect to obtain Iraqi oil through Italtech and Giangrandi. Accordingly, the Bayoil Companies turned to other allocation holders. Indeed, the Bayoil Companies bought 144.9 million barrels of oil from allocation holders other than Italtech, under 38 distinct OFFP contracts, between April of 2001 and the United States-led invasion of Iraq in March of 2003. See, e.g., Bayoil USA PSR ¶ 39. On these 38 OFFP contracts, the allocation holders paid the Hussein regime a total of just over 34.5 million dollars in illegal surcharges, see, e.g., Bayoil USA PSR ¶ 39 — and

---

[12] The evidence set forth in this section focuses on the Defendants' payment of inflated commissions to allocation holders. The Defendants' involvement in making these inflated commission payments is not referred to in the various plea agreements and, in the Government's view, is not part of the loss amount for the purposes of calculating the governing Guidelines range. The Defendants' participation in the payment of these inflated commissions is described here only because it is relevant to the Court's consideration of certain of the Title 18, United States Code, Section 3553(a) sentencing factors. For example, Chalmers' participation in these surcharge payments sheds light on his "history and characteristics," see 18 U.S.C. § 3553(a)(1); the extent to which specific deterrence is necessary, see 18 U.S.C. § 3553(a)(2)(D); and the larger "circumstances" of Chalmers' offense, see 18 U.S.C. § 3553(a)(1). As noted, in the Government's view, the § 3553(a) factors weigh here in favor of the conclusion that Guidelines sentences are appropriate.

in the vast majority of the 38 contracts, the Bayoil Companies paid a commission to the allocation holder that <u>exceeded</u> the surcharge that the allocation holders were expected to pay to SOMO.  <u>See</u> Ex. QQQ.[13]

This was no coincidence.  The Bayoil Companies' commission payments generally needed to exceed the allocation holders' surcharge obligations — so that the allocation holders could use part of the commission payment to cover surcharge obligations, and could treat as profit the remainder of the commission payment.

Chalmers and the Bayoil Companies were well aware that the commission payments they were making to allocation holders were inflated.  Commissions paid between April 2001 and March 2003 averaged approximately 40 cents per barrel, <u>see</u> Ex. QQQ — much higher than the commissions that had historically been paid to allocation holders, before the Surcharge Scheme got underway.  <u>See</u>, <u>e.g.</u>, Ex. RRR (December 2000 memorandum: "M. [market] Cost Historically supported in New York at levels 20-25 due to risk of

---

[13] The documents that are contained within Exhibit QQQ are listed on the first page of that Exhibit.  Within Exhibit QQQ, materials that relate to a particular contract are separated from materials that relate to another contract by a blue sheet of paper.  With respect to any particular contract, the materials contained within Exhibit QQQ generally include, in order: United Nations contract approvals; the relevant contracts and any amendments to the contracts; bank records that reflect payments to the United Nations escrow account; and bank records that reflect payments by the Bayoil Companies to the allocation holder in connection with the relevant contract.

handling, etc.") (BAY 04-1805 - 1809); Ex. SSS (January 2001 memorandum called "Trading Priorities Week of January 2, 2001," that identified the "historical premium" associated with eight oil suppliers as 20-25 cents) (BAYOILUSA 14529-31, BAYOILUSA 11345).

To cite one example of how commissions were inflated, on April 3, 2000 — prior to the onset of the Surcharge Scheme — an employee of the Bayoil Companies proposed to a particular supplier that the Bayoil Companies would pay a commission of 5-7 cents on each barrel of Iraqi oil. By contrast, on July 16, 2001 — after the onset of the Iraqis' demand for a 30-cent per barrel surcharge — the employee of the Bayoil Companies proposed to the same supplier a 40 cent per barrel commission. See Ex. TTT (BAYOILUSA 014433, BAYOILUSA 014436).

It was obvious to market participants that inflated commissions were being used by allocation holders to satisfy surcharge obligations to the Hussein regime. To cite one example, a United States-based witness ("Buyer-1") has told the Government that he was approached by a particular allocation holder ("Allocation Holder-1") who wanted to sell Buyer-1 Iraqi oil; Allocation Holder-1 sought a commission of 48 cents per barrel, and explained to Buyer-1 that Allocation Holder-1 would require from Buyer-1 so large a commission payment to insure that Allocation Holder-1 could cover Allocation Holder-1's surcharge obligations. In the face of this explicit demand from Allocation Holder-1 — for

a commission payment large enough that part of it could be kicked back to the Hussein regime — Witness-1 refused Allocation Holder-1's offer of Iraqi oil.  The Bayoil Companies, by contrast, bought about 11 million barrels of oil from Allocation Holder-1 during Phases 9, 10, and 11 of the OFFP, each time paying a commission of more than 40 cents to Allocation Holder-1.  See Ex. UUU (SNT 22553-22555, 22566, 22568, 22602, 23121-23122, 22449, 23252, 23253-54, 23261-62, 25144-25146, 26004-06, 25965, 40222-223, 26708-10).

The Bayoil Companies could hope to make a profit — while still paying inflated premiums to their Iraqi oil suppliers — because the price at which the Bayoil Companies bought Iraqi oil, the OSP, was artificially lowered.  See supra; see also 11/27/07 Sentencing Transcript of Oscar S. Wyatt, Jr. at 26 (the Court's finding: "the official selling price was depressed and that millions of dollars were diverted from the Oil-for-Food Program").

Indeed, an employee of the Bayoil Companies, Dionissiev, alluded to this relationship between the deflated OSP, and inflated commissions payments, in a December 13, 2000 memorandum to an energy company.  As Dionissiev put it in the memorandum: "recent Iraqi requests make it prohibitive from quoting any premiums or taking risque [sic] commitments before knowing the applicable OSP."  See Ex. VVV (BAYOILUSA 014281).  In Dionissiev's view, premium payments could not be quoted until after it was known what the OSP would be — because premiums needed to cover "recent Iraqi requests"

33

for surcharges, and if the OSP were set too high, that would not be possible.

Chalmers and the Bayoil Companies worked to reduce the OSP, in part, by sending fraudulent informational letters to the United Nations officials who set the price of Iraqi oil.   These letters purported to provide detailed and accurate information on conditions in the oil market that would be useful to U.N. officials as they set the OSP.   See generally Ex. WWW (June 2001 Chalmers letter to the United Nations that describes prior letters to U.N. officials as containing "well documented market information," and prepared "in the spirit of assisting The Overseers to achieve their sole mandate of establishing monthly price mechanisms which are reflective of fair market conditions")   (BAY04-1301-02, 1304-05, 1137-38).

However, Chalmers' letters to United Nations officials consistently misrepresented actual market conditions.   None of these letters apprised the United Nations that the cost of Iraqi oil was being driven up by the Government of Iraq's demand for surcharges — indeed, Chalmers' letters did not mention the surcharges, even as Chalmers was working on a "mechanism," Ex. FFF, by which the surcharges would be paid.   See, e.g., Ex. XXX (November 20, 2000 Chalmers letter to United Nations officials that itemized "applicable costs" for moving oil from Iraq to the United Sates — but included no reference to the cost of satisfying

34

surcharge obligations) (BAY04-1832 - 36); Ex. YYY (January 12, 2001 Chalmers letter to United Nations officials that itemized "applicable costs" for moving oil from Iraq to the United Sates – but included no reference to the cost of satisfying surcharge obligations) (BAY04-1218 - 19, BAY04-1222); Ex. ZZZ (additional examples) (BAY04-01850-59, BAY04-1862-65; BAY04-1216-20; BAY04-1316-21; BAY04-00772-81; BAY04-01836, 1838-40; BAY04-1216-19).

In addition, Chalmers' United Nations letters falsely suggested that the OSP should be reduced — in part because market participants were assertedly bearing large "miscellaneous" costs. See, e.g., Ex. AAAA (itemization of the various costs associated with shipping crude oil that allocates thirty-five cents per barrel for "miscellaneous" costs) (BAY04-01832-36), Ex. BBBB (same) (BAY04-01852-54). However, these out-sized "miscellaneous" costs were fictional. Cf. Tr. 1258:12 - 1261:5 (testimony of Mubdir al-Khudhair) (describing the implausibility, in an Oscar Wyatt-prepared itemization of the various costs associated with shipping crude oil, of allocating forty cents per barrel for "other").

The efforts by the Bayoil Companies and Chalmers artificially to lower the OSP are illuminated by the Bayoil Companies' dealings with the entity typically known as Rosneft, a Russian oil company with which Dionissiev routinely dealt. See, e.g., Ex. CCCC (BAY 04-1891-93, BAYOILUSA 004820).

Chalmers wrote to Rosneft by memorandum dated December 8,

2000, in the period just after the onset of the Surcharge Scheme.
See Ex. DDDD (BAYOILUSA 012459).  According to Chalmers' December
8th memorandum, the Bayoil Companies would be willing to pay larger
premiums to Rosneft, see id. ("[p]lease be assured of our
commitment to provide you with any additional support under our
existing contract"), of the kind that would cover payment by
Rosneft of its surcharge obligations.  But, according to the
December 8th memorandum, Rosneft would be asked by the Bayoil
Companies to provide "assistance during future months in forwarding
to SOMO any relevant market and economic information which may be
relevant to assisting SOMO in determining this official discount."
Id.

          That is precisely what happened.  The pre-Surcharge
Scheme premium that the Bayoil Companies paid to Rosneft was 24
cents per barrel; following the onset of the Surcharge Scheme, on
January 18, 2001, the premium jumped to 35 cents, see Ex. EEEE (SNT
017013, SNT 019085) — enough for Rosneft to satisfy its surcharge
obligations.

          After the Bayoil Companies' premium to Rosneft was
raised, a pricing memorandum was prepared, addressed from Rosneft
to the OFFP oil overseers.  The pricing memorandum sought "urgent"
action to reduce the OSP based on "a summary of . . . economic
conditions" — but did not mention that one of these "economic
conditions" was the Government of Iraq's demand for surcharges.

<u>See</u> Ex. FFFF (BAYOILUSA 011351 - 011354, BAYOILUSA 011355 - 011360). Chalmers sent the pricing memorandum to Rosneft, <u>see id.</u> at BAYOILUSA 011356, and Dionissiev was asked to e-mail the memo to Rosneft, so that the memorandum could be more readily placed onto Rosneft's letterhead before being sent on that letterhead to the OFFP oil overseers. <u>See id.</u> at BAYOILUSA 11355.

## LAW

While the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." <u>United States v. Booker</u>, 543 U.S. 220 (2005). In furtherance of that goal, judges are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." <u>Id.</u> at 259-60.

In sentencing defendants, district courts should consider the factors set forth in 18 U.S.C. § 3553(a). This provision provides that the sentencing "court shall impose a sentence

sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

    (C)  to protect the public from further crimes of the defendant;

    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)  any pertinent policy statement [issued by the Sentencing Commission];

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

38

similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

In <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Court of Appeals explained that district courts should now engage in a three-step sentencing procedure in light of <u>Booker</u>. First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." <u>Id.</u> at 112. Second, the court should consider whether a departure from that Guidelines range is appropriate. <u>Id.</u>   Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and determine the sentence to impose. <u>Id.</u> at 113.

### THE GUIDELINES RANGES

Under the terms of the Chalmers Plea Agreement, the parties have agreed, among other things, that Chalmers' sentencing range under the Guidelines is a term of imprisonment of 37 to 46 months and a fine of $7,500 to $75,000. These ranges are based upon a Criminal History Category of I and a Guidelines offense level of 21. Under the Chalmers Plea Agreement, the Guidelines offense level was calculated as follows: a base offense level of six, pursuant to U.S.S.G. § 2F1.1; a two-level enhancement for more than minimal planning, <u>see</u> U.S.S.G. §2F1.1(b)(2); an additional

two-level enhancement because a substantial part of Chalmers'
fraudulent scheme was committed outside the United States and the
offense otherwise involved sophisticated means, <u>see</u> U.S.S.G.
§2F1.1(b)(6); a fourteen-level enhancement because the loss
resulting from Chalmers' criminal conduct was more than $5,000,000
and less than $10,000,000, <u>see</u> U.S.S.G. § 2F1.1(b)(1)(O); and a
three-level reduction for acceptance of responsibility, <u>see</u>
U.S.S.G. §§ 3E1.1(a), 3E1.1(b).[14]

Under the terms of the Bayoil USA Plea Agreement, the
parties have agreed, among other things, that Bayoil USA's
sentencing range under the Guidelines is a fine of $9,016,151.40 to
$18,032,302.80. This range is based upon the following
calculations: for purposes of calculating a fine, the defendant's
offense level is established by reference to the relevant Guideline
in Chapter Two, <u>see</u> U.S.S.G. § 8A2.3; this yields a Guidelines
offense level of 21 — a base offense level of six, pursuant to
U.S.S.G. § 2F1.1; a two-level enhancement for more than minimal
planning, <u>see</u> U.S.S.G. §2F1.1(b)(2); an additional two-level
enhancement because a substantial part of Bayoil USA's fraudulent
scheme was committed outside the United States and the offense

_____

[14]   The Probation Office has calculated a higher sentencing
range for Chalmers — because, in the Probation Office's view,
after <u>Booker</u>, there is no longer an <u>ex</u> <u>post</u> <u>facto</u> problem with
applying the current version of the Guidelines.  <u>See</u> Chalmers PSR
¶ 48.  The Government adheres to both the Guidelines calculations
and the sentencing ranges set forth in the various plea
agreements.

otherwise involved sophisticated means, see U.S.S.G. §2F1.1(b)(6);
and a fourteen-level enhancement because the loss resulting from
Bayoil USA's criminal conduct was more than $5,000,000 and less
than $10,000,000, see U.S.S.G. § 2F1.1(b)(1)(O).   Pursuant to
U.S.S.G. § 8C2.4, the base fine is $9,016,151.40 (the loss, as
agreed upon by the parties, caused by Bayoil USA's criminal
conduct)which is greater than the base fine prescribed by Guideline
offense level 24 ($2,100,000).   Pursuant to U.S.S.G. § 8C2.5(a) &
(b)(5), Bayoil USA's "culpability score" is five, calculated by:
(a) adding one point to the base score of five because the
defendant-organization had ten or more employees and an individual
with substantial authority personally participated in, condoned, or
was willfully ignorant of the offense; and (b) subtracting one
point, pursuant to U.S.S.G. § 8C2.5(g)(3), because the defendant
has demonstrated a clear recognition and affirmative acceptance of
responsibility for its criminal conduct.   Pursuant to U.S.S.G. §
8C2.6, Bayoil USA's "culpability score" of five yields a minimum
fine multiplier of 1 and a maximum fine multiplier of 2, and
pursuant to U.S.S.G. § 8C2.7, the applicable Guideline fine range
is accordingly $9,016,151.40 to $18,032,302.80.

Under the terms of the Bayoil SNT Plea Agreement, the
parties have agreed, among other things, that Bayoil SNT's
sentencing range under the Guidelines is a fine of $9,016,151.40 to
$18,032,302.80.   This range is based upon the same calculations as

41

were used with respect to Bayoil USA.

The above-described Guidelines ranges are amply supported by the record described above.  During April of 2001, the Defendants worked together to cause $9,016,151.40 in surcharge payments to be directed to the Hussein regime.  Making these payments required more than minimal planning as well as sophisticated means – the payments were made through a non-U.S. front company, Italtech.  As to the Bayoil Defendants' culpability scores, the various plea agreements reflect these Defendants' agreements as to the number of employees that they had — and, in light of Chalmers' central role in both the charged crime and in the workings of the Bayoil Companies, there can be little doubt that an individual with substantial authority personally participated in the Bayoil Defendants' offense.

### THE FACTORS SET FORTH IN SECTION 3553(a) WARRANT GUIDELINES SENTENCES

As set forth below, the factors enumerated in 18 U.S.C. § 3553(a) indicate that a Guidelines sentence for each of the Defendants is appropriate here.

**A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The nature of the Defendants' offenses weigh in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).

The OFFP was an idealistic program.  It was designed to help the hungry and the sick, many of whom were children — and over

42

the years in which it was in existence the OFFP directed billions of dollars in aid to needy Iraqis.[15]  At the same time as it sought to aid the vulnerable, the OFFP was structured to keep Iraq's oil wealth from being used by Saddam Hussein's brutal regime. Accordingly, by participating in the Surcharge Scheme, Chalmers and the Bayoil Companies were helping to shunt oil wealth that should have been used for the benefit of the hungry and the sick of Iraq into the hands of their oppressor — a dictator whose regime was known for its persistent violence toward its neighbors; its casual murderousness toward its own people; and its hostility toward the United States.

The circumstances of the conduct in which Chalmers and the Bayoil Companies engaged underscores the need for a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).

The Defendants' criminal conduct, and the conduct of their co-conspirators, was sophisticated — it involved, among other things, secretive communications between important officials in two governments; the preparation of elaborate pricing memoranda for third parties to sign and then send on to the United Nations; the funneling of money through a foreign front company; and efforts to undermine a major international aid program by working to decrease the OSP and causing surcharges to be paid.

---

[15] This is not to suggest that the OFFP was perfect.  For example, the former Executive Director of the Program has been indicted by a Grand Jury sitting in this District.

43

In addition, at a time when United Nations officials were being flatly told by SOMO that no surcharge was being demanded, see Tr. 262:11-21, 285:4-286:1 (testimony of Michel Tellings), the Defendants were well aware of the Surcharge Scheme — and took no steps to alert relevant authorities.

Indeed, Chalmers and the Bayoil Companies did more than sit by in silence.  They sent numerous letters to United Nations officials that affirmatively made it seem as if everything was fine — that the costs associated with participating in the market for Iraqi oil were limited to business-as-usual items, like insurance and freight charges and hedging.  These letters systematically created a false impression by avoiding any mention of what, for Chalmers and the Bayoil Companies, could only have been the elephant in the room — the fact that the rumors in the marketplace and in the media were true, that the Hussein regime was indeed seeking illegal kickbacks as the price of doing business.

Chalmers and the Bayoil Companies not only failed to sound the alarm on the Hussein regime's exploitation of the OFFP, they stoked the fires.  During the crucial month of December 2000 — when all other companies refused to buy Iraqi oil because of the requests for surcharges — Chalmers and the Bayoil Companies leapt right into the market.  During December of 2000, they obtained massive quantities of oil through a front company, and, on that oil, were soon channeling more than 9 million dollars in surcharge

44

payments toward the Hussein regime.  As a top Hussein regime official had predicted, these actions "open[ed] the gates," Chalmers PSR ¶ 33, Bayoil SNT PSR ¶ 32, Bayoil USA PSR ¶ 32, and broke the "psychological barrier," Ex. GG; the Defendants showed the way for an entire industry that had, until that point, been too scrupulous or too fearful of being caught to pay kickbacks to the Government of Iraq.  The December 2000 actions of Chalmers, the Bayoil Companies, and their co-conspirators made it clear that it was possible to pay surcharges; to get Iraqi oil — and, temporarily at least, to get away with it.

These actions were important to the Hussein regime.  When he wrote to the Iraqi Minister of Oil to complain that oil was being cut off, Chalmers made it clear that he understood just how important breaking the "psychological barrier" had been for Iraq. As Chalmers put it: "[Y]ou should know that despite the difficult market circumstances Bayoil encountered as a result of resuming an ambitious lifting program in December/January, at your request, while other lifters backed off, we contractually agreed with our prime supplier a price mechanism which covered SOMO standard terms and conditions." Ex. FFF (April 12, 2001 Chalmers letter).  Just over a year later, in another letter to the Minister of Oil, Giangrandi — Chalmers' and the Bayoil Companies' agent — described the events of late 2000 in similar terms: "we re-opened the lifting during the difficult period of December 2000 and did everything

45

possible to help S.O.M.O. to 'open the Gate.'" Ex. PPP.  In short, the Defendants saw clearly what they had done for the Hussein regime — by helping to jumpstart the Surcharge Scheme, they had performed a valuable service, and one for which they expected recognition.

Even after December of 2000, Chalmers and the Bayoil Defendants took an approach to the oil market that sounded only in dollars and cents, not right and wrong; their approach to doing business was unencumbered by any concern with the illegality or impropriety of paying surcharges to the Hussein regime.  Chalmers, for example, was utterly unfazed when Giangrandi sought to show him an attorney's March 2001 opinion letter that indicated that if Giangrandi paid surcharges he would be participating in a criminal conspiracy with Bayoil SNT.  As Chalmers explained, he was already aware of this fact.  But a week after the letter was discussed, when SOMO indicated that it would cut off oil because of surcharge delinquencies, Chalmers sprung into action — working out in Geneva a "mechanism," Ex. FFF, by which he could pay surcharges without getting caught.  When faced with the choice between not breaking the law and getting more oil, Chalmers picked the oil.

After April 2001, to facilitate making inflated premium payments, Chalmers and the Bayoil Companies worked to lower the OSP, by writing letters to the United Nations.  For Chalmers and the Bayoil Companies, a reduced OSP simply made good business

46

sense.  But for the Iraqi people, a reduced OSP meant vastly less food and medicine; and for the Hussein regime, a reduced OSP meant that for all the labored architecture of the OFFP, the Government of Iraq could continue to obtain unfettered cash under the world community's radar.  These should have been compelling countervailing considerations.  But there is no indication that they gave Chalmers or the Bayoil Defendants a moment's pause.

Pursuant to 18 U.S.C. § 3553(a)(1), the Court is also directed to look at the history and circumstances of each of the Defendants.  Here, these do not suggest any substantial mitigation.

While the relevant PSRs describe at length the corporate histories and financial status of Bayoil SNT and Bayoil USA, there is no indication that these entities have in any sense been especially impressive corporate citizens; there is no suggestion, for example, that the Bayoil Companies have made major donations to charitable causes, or otherwise sought to benefit the public.

Similarly, it does not appear that Chalmers' life has been marked by extraordinary acts, against which his criminal conduct should be weighed.  For example, the Chalmers PSR makes no mention of large contributions to charity or substantial service to the needy or to civic organizations.  Moreover, Chalmers' personal circumstances do not suggest that his crime was the product of financial desperation.  Chalmers is wealthy, see Chalmers PSR ¶¶ 88-99 — for example, at its peak in 1999, Bayoil SNT, which

Chalmers owned and operated, had revenues of over 3 billion dollars. Id. at ¶¶ 88, 90. Whatever money Chalmers made by buying surcharge-laden Iraqi oil was money that he plainly wanted; but it was not money that Chalmers somehow needed.

**B.    The Need for the Sentence Imposed to:**

> **1.    Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

This factor weighs in favor of a Guidelines sentence. For the reasons stated above, the Defendants' offenses of conviction were serious ones; imposing a Guidelines sentence would constitute just punishment.

A Guidelines sentence would also promote respect for the law.  The Defendants labored to evade justice — for example, by using a foreign front company.  A Guidelines sentence would enhance respect for the law by emphasizing that these evasive efforts have come to naught.

> **2.    Afford Adequate Deterrence**

This factor — a concern for general deterrence — cuts in favor of a Guidelines sentence.  A Guidelines sentence for each of the Defendants would emphasize to others that they can be brought to justice and made to face the consequences of their actions, no matter how sophisticated their crimes.

> **3.    Protect the Public from Further Crimes of the Defendant**

48

Specific deterrence concerns are also a material consideration for the Court. The Defendants' crimes — the core of which was paying illegal kickbacks to foreign government — are the sorts of offenses that can readily be committed again in the future, especially by participants in the global oil industry. There is no indication that Chalmers plans to leave that industry. Chalmers has worked in the petroleum business for more than 30 years, see Chalmers PSR ¶ 87, and he continues to own and operate the Bayoil Companies. See id. at ¶ 88. These entities are no longer in the oil-trading business, as the press of investigations (and, ultimately, an Indictment) has made it difficult for them to secure financing. See Bayoil SNT PSR ¶ 72; Bayoil USA PSR ¶ 66. But it can hardly be said that these entities are moribund. Together, they manage an oil refinery, see Bayoil SNT PSR ¶ 73, Bayoil USA PSR ¶ 69, and each of the Bayoil Companies had substantial assets during 2006, the last year for which balance sheet information is included in the respective PSRs. See Bayoil SNT PSR ¶ 79 (2006 assets: $59,615,393); Bayoil USA PSR ¶ 73 (2006 assets: $2,430,944).

Moreover, Bayoil SNT continues to employ John Irving, who was charged in the same Indictment as Chalmers and the Bayoil Companies, see Bayoil SNT PSR ¶ 70, and whose extradition from the United Kingdom is pending. Similarly, Bayoil USA continues to employ Ludmil Dionissiev, see Bayoil USA PSR ¶ 66, who was also

charged in the referenced Indictment, and who pleaded guilty before Your Honor to a crime connected to the OFFP.  With regard to recidivism — and the concomitant need for specific deterrence — these facts speak volumes.  It is difficult to believe that the Defendants have fully turned over a new leaf while they continue to employ people who, in connection with the OFFP, have been convicted of a federal felony (Dionissiev) and stand accused of a federal felony (Irving).[16]

> **4.  Provide Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effect Manner**

These concerns are not relevant for the Bayoil Companies. As to Chalmers, in light of his age, the need for educational or vocational training should not factor into the Court's analysis, and given Chalmers' generally good health, the need for medical care should not be a substantial factor here.

### C.   The Kinds of Sentences Available

At a Guidelines range for Chalmers of 37-46 months, a sentence of incarceration is called for.  See U.S.S.G. § 5C1.1(f). As to the Bayoil Defendants, in addition to financial penalties, the Court may impose a term of probation of one to five years.  See Bayoil USA Plea Agreement at 4, see Bayoil SNT Plea Agreement at 4.

---

[16]  While the Defendants' retention of Irving and Dionissiev arguably suggest that they have not fully accepted responsibility for their crimes, the Government hews to the various plea agreements, which reflect reductions in sentence for acceptance of responsibility.

Under 18 U.S.C. § 3553(a), the Court is directed to consider the various available options with regard to fashioning an appropriate sentence.

>    **D.    The Kinds of Sentence and the Sentencing Range Established [in the Sentencing Guidelines]**

This factor weighs heavily in favor of a Guidelines sentence. <u>See</u> <u>generally</u> <u>United States v. Rattoballi</u>, 452 F.3d 127, 131 (2d Cir. 2006) ("[T]he guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors . . . .") (citations and internal quotation marks omitted); <u>cf.</u> <u>United States v.</u> <u>Fernandez</u>, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences") (citations omitted) (quoting <u>United States v. Rubenstein</u>, 403 F.3d 93, 98-99 (2d Cir. 2005)).  As the Supreme Court has recently stated: " . . . to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 128 S.Ct 586, 596 (2007).

>    **E.    Pertinent Policy Statements [Issued by the Sentencing Commission]**

There are no pertinent policy statements issued by the Sentencing Commission that suggest a reason that any of the Defendants here should be sentenced to anything but a Guidelines sentence.

**F.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

This factor cuts in favor of a Guidelines sentence.  Most judges continue to follow the Guidelines in imposing sentence, such that imposing a Guidelines sentence will tend to reduce sentencing disparities.  See Booker, 543 U.S. 220 at 250, 253, 264.

In addition, defendant Dionissiev received a sentence within the agreed-upon Guidelines range — principally, a fine of $5,000 and a term of probation.  As the Court noted at sentencing, Dionissiev's culpability is substantially less than that of the other OFFP co-defendants that have appeared before the Court.  Similarly, while co-defendant Wyatt received a sentence below the agreed-upon Guidelines range, this was, in large part, based on Your Honor's determination that, over the course of his life, Wyatt had done a number of extraordinary charitable deeds, from providing for the medical needs of various people to helping to secure safe passage for his employees when they found themselves in dangerous situations.  The record does not suggest that Chalmers has conducted himself in similar fashion.

**G.    The Need to Provide Restitution to Any Victims of the Offense**

The Defendants' crimes victimized both the United Nations and the people of Iraq.  As set forth in the Chalmers Plea Agreement, the Bayoil USA Plea Agreement, and the Bayoil SNT Plea

Agreement, the total amount of restitution for Chalmers, Bayoil USA, and Bayoil SNT is $9,016,151.40.

## CONCLUSION

For all of the foregoing reasons, the Court should sentence each of the Defendants to a sentence within the applicable Guidelines range.

Dated:   New York, New York
         February 22, 2008


                        Respectfully Submitted,

                        MICHAEL J. GARCIA
                        United States Attorney


                        By: _____/s/_____
                            EDWARD O'CALLAGHAN
                            MICHAEL FARBIARZ
                            Assistant United States Attorneys
                            Tel. No.: (212) 637-2634/1587

53

## CERTIFICATE OF SERVICE

MICHAEL FARBIARZ, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury that a true and correct copy of the foregoing was served via overnight courier on the below-listed date on:

Andrew Weissmann, Esq.
Jenner and Block
919 Third Avenue
37th Floor
New York, New York 10022


Dated:    New York, New York
          February 22, 2008

                          /s/ Michael Farbiarz

54